UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

PAULLA DOVE JENNINGS, ET AL.,
Plaintiffs

v. C.A. 03-572-T

STEPHEN M. PARE, ET AL.

**MEMORANDUM AND ORDER**

ERNEST C. TORRES, Chief Judge.

Adam Jennings (Jennings), his mother, Paulla Dove Jennings, and Keith Huertas (the "Plaintiffs") are members of the Narragansett Indian Tribe (the Tribe). They brought this action against Kenneth Jones (Jones) and several other Rhode Island state troopers seeking damages for injuries allegedly sustained during a scuffle that occurred while the troopers were executing a search warrant in a "smoke shop" operated by the Tribe.

A jury returned a verdict in favor of the defendants on most of the claims but found in Jennings' favor on his claims against Jones, under § 1983, for excessive force and, under state law, for battery. The jury awarded Jennings $301,100 in compensatory damages for a broken ankle that he sustained during the scuffle.

Jones has moved for judgment as a matter of law on the ground that he is shielded from liability by the doctrine of qualified immunity. Jones also has moved for a new trial or, alternatively, to "Alter/Amend the Judgment by granting a Remittitur."

Since this Court finds that the doctrine of qualified immunity protects Jones from liability, his motion for judgment as a matter of law is granted and the remaining motions become moot.

**Background**

In July 2003, the Rhode Island State Police received information that the Tribe was selling cigarettes to the general public in a smoke shop that it operated on tribal property in Charlestown, Rhode Island and that the Tribe was not collecting the tax on tobacco products imposed by Rhode Island law. Accordingly, troopers obtained a state court warrant to search the smoke shop and to seize documents and other evidence of untaxed cigarette sales.[1]

On July 14, 2003, the day on which the warrant was to be executed, a crowd consisting primarily of Tribal members, Tribal police and several reporters accompanied by television cameras had gathered in the parking lot adjacent to the smoke shop, apparently anticipating the troopers' arrival. Four plainclothes detectives, Kenneth Bell, James Demers, Stacey Shepherd, and Michelle Kershaw,

---

[1]The statute establishing the Tribe's title to the land on which the smoke shop was located provides: "Except as otherwise provided in this subchapter, the settlement lands shall be subject to the civil and criminal laws and jurisdiction of the State of Rhode Island." 25 U.S.C. § 1708(a). However, the Tribe maintains that this provision does not authorize state police to enter onto the land for purposes of enforcing state law. See Narragansett Indian Tribe of Rhode Island v. State of Rhode Island, 296 F.Supp.2d 153 (D.R.I. 2003), appeal docketed, No. 04-1155 (1st Cir. Jan. 30, 2004).

were assigned to enter the smoke shop posing as prospective cigarette buyers. Upon a pre-arranged signal, uniformed troopers were to appear in order to secure the parking lot and assist the detectives in the smoke shop in executing the search warrant.

The three Plaintiffs and Domingo Monroe were working in the smoke shop at the time that the detectives entered. When uniformed troopers arrived in the parking lot, the detectives ordered Jennings, his mother, Monroe and Huertas to sit behind a counter in the smoke shop. The smoke shop's video surveillance camera shows that when officers attempted to escort Jennings to a seat, he grasped the edge of the counter which he testified was simply an effort to comply with the officers' instructions to show his hands. Eventually Jennings took a seat behind the counter but he acknowledges that he continued to shout obscenities at the officers and, according to the officers, Jennings kept getting out of his seat while the search was being conducted.

A videotape taken by the state police begins by showing Bell telling Jennings: "Alright? I gave you an opportunity, you're leaving." Jennings, then, is shown being escorted across the room toward the door leading to the parking lot. By that time, several uniformed troopers were entering the smoke shop. As Jennings neared the door, an order to handcuff him may be heard and Jennings may be heard shouting that he was "not getting arrested." The videotape shows an ensuing struggle between Jennings and the

officers during which Jennings appears to kick at the officers and can be seen resisting the officers' efforts to gain control of his hands. Eventually, the officers are shown wrestling Jennings to the floor.

It is undisputed that Jones entered the smoke shop just as the struggle between Jennings and the other officers began and that, before entering, Jones saw someone inside the smoke shop attempting to force the door shut on trooper Ann Assumpico's arm that was wedged between the door and the door jamb. It also is undisputed that Jones attempted to assist the officers grappling with Jennings, by grasping and twisting Jennings' ankle utilizing what was referred to as an "ankle turn control technique" (the "technique"). The uncontradicted testimony of Lieutenant Darren Delaney, an instructor at the State Policy Training Academy (the "Academy") was that troopers at the Academy, including Jones when he attended, were taught to use that technique in order to prevent an arrestee from kicking or engaging in other assaultive behavior and/or to induce compliance by a person who is actively or passively resisting arrest.

The videotape does not clearly show what happened between the time that Jennings was wrestled to the floor and the time that his ankle was broken. It does show that, while Jones was kneeling and holding Jennings' ankle, Mrs. Jennings approached Jones from behind and struck him on the head. The tape also records Jennings stating

that surgery, recently, had been performed on his ankle, and a trooper responding, "Don't resist and you won't have to worry about it."

Jennings' version of what occurred on the floor is that he had stopped moving and did not resist the troopers' efforts to handcuff him but that Jones continued to twist his ankle despite Jennings' statement about prior surgery. While Jennings admitted that he failed to comply with repeated instructions to show his hands, he stated that he was unable to do so because his left hand was pinned under his body.

Jennings' testimony that he was not actively resisting was supported by the testimony of Daniel Piccoli who claimed to have observed the struggle through an open door from outside the smoke shop and by the testimony of Domingo Monroe who was seated on the other side of the room. Piccoli also testified that he observed Jones continuing to twist Jennings' ankle after Jennings expressed concern that his ankle was going to be broken.

Jones, Demers, Wilfred Hill and Kenneth Buonaiuto, all of whom were involved in the scuffle, testified that, while on the floor, Jennings continued to forcefully twist and turn his body and to pull his hands in toward his waistband in an effort to prevent officers from handcuffing him. Hill testified that, as Jennings was lying on the floor, he kicked at Jones in an attempt to prevent Jones from grasping his ankle and Demers testified that Jennings

continued to kick violently until after his ankle was injured and he was handcuffed. Jones also testified, without contradiction, that, after being escorted from the smoke shop, Jennings boasted that "It took ten of you to take me down."

## Analysis

### DEFENDANT'S MOTION FOR JUDGMENT AS A MATTER OF LAW

### I. The JMOL Standard

In ruling on a defendant's motion for judgment as a matter of law made pursuant to Fed. R. Civ. P. 50(b) (a "JMOL motion"), a court must view the evidence in the light most favorable to the plaintiff and give the plaintiff the benefit of all reasonable inferences that may be drawn from that evidence. Vazquez-Valentin v. Santiago-Diaz, 385 F.3d 23, 29 (1st Cir. 2004). After doing so, the court should grant the motion only if the "facts and inferences reasonably drawn from those facts . . . lead to but one conclusion -- that there is a total failure of evidence to prove [the] plaintiff's case." Id. (quotation and citation omitted).

When a JMOL motion raising the qualified immunity defense is made after trial, "'deference should be accorded the jury's discernible resolution of disputed factual issues.'" Jarrett v. Town of Yarmouth, 331 F.3d 140, 147 (1st Cir. 2003) (quoting Iacobucci v. Boulter, 193 F.3d 14, 23 (1st Cir. 1999)). However,

in order to withstand a JMOL motion, the plaintiff "must have presented more than a mere scintilla of evidence" and "is not entitled to inferences based on speculation and conjecture." Vazquez, 385 F.3d at 30 (quotations and citations omitted).

In this case, Jones argues that even when the evidence is viewed in the light most favorable to Jennings, the doctrine of qualified immunity entitles him to judgment as a matter of law with respect to both the § 1983 excessive force claim and the state law battery claim.

## II. The § 1983 claim

### A. Nature and purpose of qualified immunity

The public has a strong interest in seeing that police officers and other government officials do not abuse their authority by violating the constitutional rights of others. Section 1983 serves that interest by subjecting officials who commit such abuses to personal liability in a civil suit for damages. See Anderson v. Creighton, 483 U.S. 635, 638 (U.S. 1987) ("[w]hen government officials abuse their offices, 'action[s] for damages may offer the only realistic avenue for vindication of constitutional guarantees.'" (quoting Harlow v. Fitzgerald, 457 U.S. 800, 814 (1982)).

On the other hand, the public has an equally strong interest in seeing that police officers and other government officials are not deterred from properly performing their duties by fear that

they will be exposed to potentially ruinous personal liability for every judgment they are required to make which, later, may be deemed erroneous. Id. (the public has an interest in seeing that fear of liability does not "unduly inhibit officials in the discharge of their duties.").

The doctrine of qualified immunity seeks to reconcile these competing interests by protecting police officers from "the chilling threat of liability" for difficult decisions that they must make in carrying out their responsibilities as long as their conduct is "objectively reasonable." Swain v. Spinney, 117 F.3d 1, 10 (1st Cir. 1997). In essence, qualified immunity provides "'a fairly wide zone of protection'" in to officers in "'close cases.'" Id. (quoting Roy v. Inhabitants of the City of Lewiston, 42 F.3d 691, 695 (1st Cir. 1994)).

For qualified immunity purposes an officer's conduct may be "objectively reasonable," even if it is determined to be erroneous, because the doctrine "'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.'" Hunter v. Bryant, 502 U.S. 224, 229 (1991) (quoting Malley v. Briggs, 475 U.S. 335, 343, 341 (1986)). In each case, the relevant inquiry is whether "'a reasonable officer could have believed [that what the officer did was] lawful, in light of clearly established law and the information the [officer] possessed'" at the time he acted. Id. at 227 (quoting Anderson,

483 U.S. at 641).

**B. The analytical framework**

The Supreme Court has described qualified immunity analysis as a two step process. Saucier v. Katz, 533 U.S. 194, 201 (2001); see Brosseau v. Haugen , 125 S.Ct. 596, 601 (2004) (Breyer, J., concurring). First, it must be determined whether "the facts alleged show the officer's conduct violated a constitutional right." Saucier, 533 U.S. at 201. If so, a determination must be made as to whether that right was "clearly established" so that "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Id. at 202.

The First Circuit subdivides the second step into two separate inquiries, namely: "'whether the right was clearly established at the time of the alleged violation' such that a reasonable officer would 'be on notice that [his] conduct [was] unlawful'" and whether a "'reasonable officer, similarly situated, would understand that the challenged conduct violated' the clearly established right at issue." Riverdale Mills Corp. v. Pimpare, 392 F.3d 55, 61 (1st Cir. 2004) (quoting Suboh v. Dist. Attorney's Office of Suffolk Dist., 298 F.3d 81, 90 (1st Cir. 2002)).

Under either approach, the first step, in excessive force cases, focuses on whether the force used exceeded constitutionally permissible boundaries and the second step focuses on whether a reasonable officer, nevertheless, could have believed that the

force used was lawful under the circumstances. See Saucier, 533 U.S. at 201-202; see also Riverdale, 392 F.3d at 61, 65.

Because the applicability of qualified immunity ordinarily turns on whether the specific right allegedly violated was clearly established and whether it was objectively reasonable for the officer to have believed the he was acting lawfully, the assertion of qualified immunity, generally, presents a question of law to be decided by the Court rather than a question of fact to be decided by a jury. See Mitchell v. Forsyth, 472 U.S. 511, 528 (1985); see also Acevedo-Garcia v. Monroig, 351 F.3d 547, 563 (1st Cir. 2003). Indeed, since the immunity conferred is "an immunity from suit rather than a mere defense to liability," the question, usually, should be decided before trial because the full measure of protection would be "effectively lost if a case is erroneously permitted to go to trial." Forsyth, 472 U.S. at 526 (emphasis in original); see Hunter, 502 U.S. at 537 ("Immunity ordinarily should be decided by the court long before trial."); Swain, 117 F.3d at 10 ("[T]he immunity question should be resolved, where possible, in advance of trial.").

An exception to the general rule is made when the qualified immunity decision turns on genuinely disputed questions of material fact. In those cases, the disputed facts, first, must be decided by the jury. See Swain, 117 F.3d at 10 (qualified immunity could not be determined at summary judgment stage where material facts

regarding circumstances of alleged unreasonable search were significantly in dispute).

Whether a fact is material in determining whether qualified immunity applies depends upon the circumstances of each case. In "excessive force" cases, it is not enough that a disputed fact is material with respect to whether the force used was "excessive," because, as previously stated, qualified immunity affords protection for "'mistaken judgments.'" Hunter, 502 U.S. at 229 (quoting Malley, 475 U.S. at 343). Consequently, in order to create a jury question, the disputed fact also must be material to the question of whether a reasonable officer could have believed that the force used was lawful. As the Supreme Court has said: "a material issue of fact . . . on the excessive force claim" does not require submitting the case to a jury "[i]f the law did not put the officer on notice that his conduct would be clearly unlawful." Saucier, 533 U.S. at 202.

In this case, the qualified immunity question was not decided before trial because it was not pressed until after the plaintiffs rested their case.[2] Furthermore, at the close of the evidence, this Court denied Jones' JMOL motion and submitted the case to the jury for a determination as to whether Jones used excessive force. After further consideration, this Court is convinced that it erred

[2]The state explains the delay on the ground that Jones was not named as a defendant until after the deadline for filing motions.

in denying Jones' JMOL motion which placed the jury in the untenable position of deciding the case by considering only whether the force used was excessive and doing so without evidence sufficient to establish the standard to be used as a benchmark in making that determination.

The reasons for reaching that conclusion are more fully explained below but may be summarized as follows. First, Jennings failed to present any evidence that Jones' actions deviated from the standard of conduct that should have been expected from an objectively reasonable police officer under the circumstances. Second, even if Jones' use of the "ankle turn control technique" is viewed as amounting to excessive force it did not violate any "clearly established" constitutional prohibition. Finally, the undisputed evidence demonstrates that it was "objectively reasonable" for Jones to believe that he was acting lawfully.

**C. Step One - The alleged constitutional violation**

In this case, the constitutional right allegedly violated was Jennings' 4th Amendment right to be free from "unreasonable seizures." More specifically, Jennings claims that Jones' use of the ankle turn control technique constituted excessive force.

It is well established that a police officer's use of excessive force in making an arrest falls within the 4th Amendment's prohibition against "unreasonable seizures." See Graham v. Connor, 490 U.S. 386, 394 (1989); Jarrett, 331 F.3d at 148. However, it is

equally well established that, where appropriate, a police officer making an arrest has "'the right to use some degree of physical coercion or threat thereof to effect it.'" Saucier, 533 U.S. at 208 (quoting Graham, 490 U.S. at 396)); see also Lee v. Ferraro, 284 F.3d 1188, 1200 (11th Cir. 2002) ("[T]he use of force is an expected, necessary part of a law enforcement officer's task of subduing and securing individuals suspected of committing crimes.").

The distinction between excessive force and permissible force turns on whether the level of force used was reasonable and the test is whether, under the circumstances confronting the defendant at the time that he acted, "no objectively reasonable officer would have used" the same degree of force. Isom v. Town of Warren, 360 F.3d 7, 12 (1st Cir. 2004); see Napier v. Town of Wyndham, 187 F.3d 177, 183 (1st Cir. 1999) ("'[T]he relevant inquiry [in excessive force cases] is whether no reasonable officer could have made the same choice under the circumstances.'" (internal quotation omitted)).

A plaintiff who alleges that excessive force was used bears the burden of proving it. Isom, 360 F.3d at 10 (In order to prevail on an excessive force claim, the plaintiff must establish that the force used was "objectively unreasonable under the circumstances."). Moreover, in determining whether that burden has been met, it should be recognized that police officers often are

required to make "split second judgments - in circumstances that are tense, uncertain, and rapidly evolving," and that their conduct "must be judged from the perspective of a reasonable officer on the scene," and not in the calm atmosphere of the courtroom "with the 20/20 vision of hindsight." Graham, 490 U.S. at 396-97.

Since the use of even reasonable force creates an inherent risk of injury, the mere fact that an arrestee is injured does not establish that the force used was excessive.[3] As one court has noted, "the typical arrest involves some force and injury, and the use of force is an expected, necessary part of a law enforcement officer's task of subduing and securing individuals suspected of committing crimes." Ferraro, 284 F.3d at 1200 (internal quotation and citation omitted) (emphasis in original).

In this case, the jury determined that Jones' use of the ankle turn control technique amounted to excessive force. Since it is clear that, at least initially, Jennings actively resisted arrest, the jury's determination, apparently, was based on a finding that Jones continued to twist Jennings' ankle after Jennings had stopped resisting and was under control. This Court respectfully disagrees with that finding because, in my view, the troopers' testimony that Jennings continued to kick at them and to actively resist their

---

[3]In this regard, it should be noted that, on the day following the trial, a local newspaper quoted one of the jurors as saying "I don't think it was anything intentional. The bottom line is that it was done. Somebody got hurt." Katie Mulvaney, Jury Finds Against Trooper, Prov. Journ., March 29, 2005, at A1.

efforts to pull his hands away from his waistband was much more credible than the contrary testimony of Jennings, Piccoli and Monroe.

Unlike the troopers who were directly involved in the struggle, it does not appear that either Piccoli or Monroe was in a good position to have observed what took place on the floor. Monroe was seated on the opposite side of the room and the videotape shows Bell standing between Monroe and where the struggle occurred. The videotape also show that, shortly before the struggle between Jennings and the troopers ended, Piccoli was in the middle of the parking lot, a considerable distance from the doorway to the smoke shop. Furthermore, Piccoli previously had testified before a commission investigating the smoke shop raid that the incident in question occurred <u>outside</u> the smoke shop.

It, also, is difficult to accept Jennings' testimony that, while on the floor, he did not resist the troopers' efforts to handcuff him. That testimony is inconsistent with Jennings' conduct before he was wrestled to the floor when the videotape records him exclaiming that he was "not getting arrested" and clearly shows him actively scuffling with the troopers. In addition, Jennings' testimony that he was not resisting seems inconsistent with the fact that the videotape shows that officers continued to be engaged with Jennings until his ankle was broken and the fact that, on the videotape, officers may be heard

responding to Jennings' complaint that they were hurting his ankle by telling him that he should stop resisting. Jennings' testimony, that he ceased resisting, also appears inconsistent with his subsequent boast that it took 10 troopers to take him down.

Even if Jennings had stopped actively resisting when his ankle was broken, the reasonableness of Jones' continued application of the ankle turn control technique must be judged in light of Jennings' earlier conduct and the facts available to Jones at the time that he acted. Having just entered the smoke shop, Jones had no way of knowing why Jennings was being arrested or whether he was armed. Consequently, Jennings' failure to show his hands was a legitimate cause for concern and, coupled with the fact that Jones had no way of knowing whether Jennings might resume kicking, a good reason for maintaining the ankle hold until Jennings was handcuffed and fully under control, which clearly did not occur until after Jennings' ankle was broken.[4] Indeed, Delaney, who Jennings adopted as his own expert witness, testified that, under the circumstances, Jones acted reasonably in maintaining the ankle hold because releasing it would have left Jones vulnerable to injury.

Nevertheless, this Court's disagreement with the jury's finding that Jones used excessive force is not a ground for granting Jones' JMOL motion. Unlike a motion for a new trial, a

---

[4]Jones also had no way of knowing whether Jennings' statement that surgery had recently been performed on his ankle was true or merely a ruse to get Jones to release his hold.

JMOL motion does not permit a court to make its own assessment regarding the credibility of witnesses or the weight of the evidence. Vazquez, 385 F.3d at 29. The jury's finding must be accepted unless "there is a total failure of evidence" to support it. Id.; see 9A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure, § 2524 (2nd ed. 1987).

In this case, Jennings failed to present any evidence that, under the circumstances confronting Jones, "no objectively reasonable officer" would have applied the ankle turn control technique in the manner that Jones did. Put another way, Jones' actions must be judged in accordance with the standard of conduct expected of an "objectively reasonable officer" under the circumstances, and it was incumbent on Jennings to establish that Jones' actions deviated from that standard. Here, the only evidence with respect to what a reasonable officer would have done under the circumstances was Delaney's testimony that Jones acted properly in continuing to apply the ankle turn control technique until Jones was fully under control and in custody and that Jones' use of force was reasonable under the circumstances. Although Delaney did acknowledge that the continuum of force was a "two way street," meaning that, if the level of resistance changes, the level of force used should be adjusted upward or downward to correspond to what is appropriate at the level of resistance, he also made it clear that use of the ankle turn control technique is

appropriate to overcome either active or passive resistance by an arrestee. More specifically, Delaney testified that it would have been appropriate for Jones to maintain the ankle turn control technique even if Jennings was not kicking and the officers were "just trying to get the flex cuffs on him."

In short, there was an absence of any evidence that "no objectively reasonable officer" would have used the level of force used by Jones and, therefore, the jury unfairly was put in the untenable position of trying to decide that question without sufficient evidence of the applicable standard for measuring the lawfulness of Jones' conduct. In that respect, this case is markedly similar to Isom where the First Circuit upheld the entry of judgment as a matter of law in favor of a police officer sued for "excessive force" for using pepper spray because:

> No expert testified that, under the circumstances faced by Detective Clancy, no reasonable officer would have used pepper spray; in fact, the plaintiffs did not produce any expert testimony at all. Nor did the plaintiff produce any written policy or text stating that the use of pepper spray in circumstances such as those faced by Clancy was not reasonable.

Isom, 360 F.3d at 12.

Isom also rejected the argument that such evidence was unnecessary and that the issue of excessive force "should have been left to the jury's common sense." Isom, 360 F.3d at 12. In doing so, the court stated that: "[f]or the jurors to have been given an

opportunity to exercise their common sense on the ultimate question of whether no objectively reasonable officer would have used pepper spray, there must have been some basis in the evidence on which to ground that determination." Id.

**D. Whether the Right was a Clearly Established Right**

Even assuming, arguendo, that Jennings presented sufficient evidence to support a finding of excessive force, that finding would bear only on the first step of qualified immunity analysis. The analysis does not end there because "[q]ualified immunity shields an officer from suit when she makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances she confronted." Brosseau, 125 S.Ct. at 599. Accordingly, at the second step of qualified immunity analysis inquiry must be made into whether, under the circumstances, no "objectively reasonable officer" could have believed that the force used was lawful. See Brosseau, 125 S.Ct. at 599; Saucier, 533 U.S. at 205. Put another way, the issue becomes "whether the officer had fair notice that her conduct was unlawful." Brosseau, 125 S.Ct. at 599.

In addressing that issue, the threshold question is whether the right allegedly violated was "clearly established" at the time the officer acted. Brosseau, 125 S.Ct. at 599. That determination must be made "against the backdrop of the law at the time of the conduct." Id. In order for a right to be "clearly established,"

"'[t]he contours of the right must be sufficiently clear that a reasonable [officer] would understand that what he is doing violates that right.'" Id. (quoting Saucier, 533 U.S. at 202 (internal quotation omitted)).

In this case, the right at issue is Jennings' 4 th Amendment right to be free from unreasonable seizures. However, the Supreme Court has cautioned that, because determining whether a right is clearly established "serves to advance understanding of the law," the inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." Saucier, 533 U.S. at 201. If the inquiry is made at an overly general level by defining the right too broadly, it would "convert the rule of qualified immunity . . . into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights." Anderson, 483 U.S. at 639. Thus, "[i]t does no good to allege [at the first step] that police officers violated the right to free speech and then [at the second step] conclude that the right to free speech has been clearly established in this country since 1791." Riverdale, 392 F.3d at 62 (quoting Int'l Action Ctr. v. United States, 365 F.3d 20, 25 (D.C. Cir. 2004)).

Whether a right, defined at the appropriate level of specificity, was "clearly established," ordinarily, is a question of law that must be decided by the court rather than the jury. See Suboh, 298 F.3d at 90 (both the second and third steps of qualified

immunity analysis are questions of law). The "core concern" is whether "[p]rior case law [gave] the officer reasonable notice that the specific conduct [he] is alleged to have committed in this litigation is unlawful." Riverdale, 392 F.3d at 65-66.

In an excessive force case, unless it is obvious that the force used was excessive, the Court must look to prior case law to determine whether it was clearly established that the Constitution prohibited the type of conduct in which the officer engaged under the specific circumstances confronting the officer. See Brosseau, 125 S.Ct. at 599.

Here, it is not obvious that Jones used excessive force. At worst, this is one of those "'close cases,'" Swain, 117 F.3d at 10(quoting Roy, 42 F.3d at 695), in which there is a "'hazy border between excessive and acceptable force,'" Saucier, 533 U.S. at 206 (quoting Priester v. Rivera Beach, 208 F.3d 919, 926-27 (11th Cir. 2000)). Therefore, in order to determine whether Jones' use of the ankle turn control technique violated a clearly established constitutional right, the Court must look to prior case law.

Jennings is unable to cite any case, decided either before or after July 14, 2003, that holds use of the ankle turn control technique, or any similar technique, in arresting an uncooperative subject to be unconstitutional. In fact, the few cases in which similar pain control or compliance techniques were used to arrest uncooperative subjects indicate that the use of such techniques

does not amount to excessive force. See Forrester v. City of San Diego, 25 F.3d 805, 807 (9th Cir. 1994) (affirming jury verdict that "physical pressure administered on [anti abortion] demonstrators' limbs in increasing degrees, resulting in pain" did not violate Fourth Amendment where demonstrators "'passively resisted'" arrest by remaining seated, refusing to move, and going limp when officers attempted to escort them to police van); see also Brownell v. Figel, 950 F.2d 1285, 1289, 1293 (7th Cir. 1991) (applying pressure to nerve behind jaw bone in order to induce individual being arrested for drunken driving to stand up was not excessive force even though it may have aggravated a spinal injury).

In Forrester, the court found it significant that officers "did not threaten or use deadly force and did not deliver physical blows or cuts." 25 F.3d at 807. In rejecting the argument that dragging and carrying would have been a "more" reasonable method of taking demonstrators into custody the Forrester court said:

> [p]olice officers . . . are not required to use the least intrusive degree of force possible. Rather, . . . the inquiry is whether the force that was used to effect a particular seizure was reasonable, viewing the facts from the perspective of a reasonable officer on the scene. [citation omitted]. Whether officers hypothetically could have used less painful, less injurious, or more effective force in executing an arrest is simply not the issue.

Forrester, 25 F.3d at 807-808. Indeed, after the fact speculation about "more" reasonable actions that an officer might have taken

invites the very type of hair splitting and Monday morning quarterbacking that qualified immunity seeks to protect against.

Here, on July 14, 2003, there was no "clearly established" law that would have put Jones on notice of any constitutional prohibition against use of the ankle turn control technique under the circumstances confronting him.

E. **Whether the Alleged Violation was Apparent to an Objectively Reasonable Officer**

The doctrine of qualified immunity also recognizes that, even in cases where the law is clear regarding the type of conduct that is or is not lawful under particular circumstances, an officer reasonably may misapprehend the circumstances confronting him because the "factual situation [confronting the officer] might be ambiguous or the application of the legal standard to the precise facts at issue might be difficult." Riverdale, 392 F.3d at 61. Consequently, in such cases, "the officer's actions may be objectively reasonable and she may be entitled to qualified immunity" even if the right allegedly violated was clearly established. Id.

For example, in an excessive force case "[i]f an officer reasonably, but mistakenly, believed that a suspect was likely to fight back, . . . the officer would be justified in using more force than in fact was needed." Saucier, 533 U.S. at 205. Similarly, "[a]n officer might correctly perceive all of the relevant facts but have a mistaken understanding as to whether a

particular amount of force is legal in those circumstances." Id. In either event, as long as "the officer's mistake as to what the law requires is reasonable . . . the officer is entitled to the immunity defense." Id.

Although a "reasonable officer" standard is utilized both at step one to determine whether the force used was excessive and at step two to determine whether the officer reasonably could have believed that it was lawful, the Supreme Court has held that the two inquiries are separate and distinct. In Saucier, the Supreme Court made it clear that the step one inquiry focuses on whether the force used, in fact, was reasonable; whereas, the step two inquiry focuses on whether the officer reasonably, albeit mistakenly, could have believed that the force used was lawful. Specifically, Saucier expressly rejected the argument that a finding of excessive force precludes a finding that the officer reasonably could have believed that the force used was permissible. See Saucier, 573 U.S. at 204-206.

Here, the evidence clearly demonstrates that, even if he was mistaken, Jones reasonably could have believed that his utilization of the ankle turn control technique was lawful. As already noted, Jones did not know why Jennings was being arrested or whether he was armed. Nor could Jones have known, with any certainty, why Jennings failed to heed orders to show his hands. Moreover, even if Jennings had stopped actively resisting, Jones had no way of knowing whether Jennings would resume kicking or resisting if Jones

released his ankle hold.

In addition, as previously stated, Jones and other troopers at the Academy were taught that the ankle control technique is appropriate to subdue an arrestee who is actively resisting; to protect against the possibility that an arrestee who previously engaged in assaultive behavior might resume that behavior and/or to induce compliance by an arrestee who is passively resisting. Furthermore, Delaney, the only expert witness who testified, indicated that Jones acted properly and in accordance with departmental policy regarding use of the ankle turn control technique.

The ambiguity of the factual situation confronting Jones; the "split second" nature of the decision that he was required to make; the existence of an established departmental policy permitting use of the ankle control technique under such circumstances ; and the absence of any case law prohibiting its use, virtually compel the conclusion that it was objectively reasonable for Jones to believe that he acted lawfully.

**III. The battery claim**

The fact that, under federal law, the doctrine of qualified immunity protects Jones from liability with respect to the excessive force claim under § 1983 does not necessarily shield him from liability with respect to the state law battery claim. In order to decide whether Jones is entitled to judgment as a matter

of law on the battery claim, this Court must look to Rhode Island law. See Benning v. Bd. of Regents of Regency Universities, 928 F.3d 775, 779 (7th Cir. 1991) ("[S]tate rules of immunity are binding in federal court with respect to state causes of action."); see also Hatch v. Town of Middletown, 311 F.3d 83, 91 (1st Cir. 2002) (applying Rhode Island law to determine whether police captain entitled to qualified immunity from state law privacy claim).

The task of ascertaining state law is relatively simple when the state's highest court has definitively ruled on the precise question at issue. However, even in the absence of such a ruling, a federal court may predict what the state's highest court would decide if the applicable principles of state law are "sufficiently clear." See Hugel v. Milberg, Weiss, Bershad, Hynes & Lerach, LLP, 175 F.2d 14, 18 (1st Cir. 1999) ("[w]hen state law is sufficiently clear to allow [a federal court] to predict its course, certification is both inappropriate and an unwarranted burden on the state court" (internal quotation omitted)).

While the Rhode Island Supreme Court has not yet expressly adopted the federal doctrine of qualified immunity, it strongly has suggested that it would be so inclined. The federal doctrine of qualified immunity first was alluded to in Pontbriand v. Sundlun, where, in recognizing that a public official might be entitled to "some form of common law immunity," the court cited Harlow with apparent approval. 699 A.2d 856, 867 (R.I. 1997) (emphasis in

original). However, Pontbriand did not definitively rule on the issue because the case was decided on other grounds.

Later, in Ensey v. Culhane, 727 A.2d 687, 690 (R.I. 1999), a suit against the State Police arising out of an allegedly false arrest, the court, again, cited Harlow and said that "in an appropriate case, the doctrine of qualified immunity might well be applied by this Court." Ensey also cited, with approval, the following passage from Hunter:

> Our cases establish that qualified immunity shields [law enforcement officers] from suit for damages if 'a reasonable officer could have believed [the arrest] to be lawful, in light of clearly established law and the information the [arresting] officers possessed.' [citation omitted]. Even law enforcement officials who 'reasonably but mistakenly conclude that probable cause is present' are entitled to immunity.

Ensey, 727 A.2d at 691 (quoting Hunter, 502 U.S. at 227 (internal citations and quotations omitted)) (inserts in original). However, once more, the court did not rule directly on the qualified immunity question because the case was decided on other grounds.

The First Circuit has described Pontbriand and Ensey as "reflect[ing] Rhode Island's recognition of a qualified immunity defense under state law analogous to the federal doctrine established by the United States Supreme Court in Harlow v. Fitzgerald." Hatch, 311 F.3d at 90. Accordingly, the First Circuit has concluded that applicability of the federal doctrine of qualified immunity to state law claims "is well grounded in the law of Rhode Island." Id.

Thus, it seems "sufficiently clear" that Rhode Island would join the ranks of other states that have applied the federal doctrine of qualified immunity to state law claims. See, e.g., Stearns v. Vermont, 833 A.2d 835, 840 (2003) (applying Harlow qualified immunity standard to state law claims in affirming summary judgment in favor of probation officer with respect to allegedly unlawful search); Jenness v. Nickerson, 637 A.2d 1152, 1159 (Me. 1994) (applying Harlow qualified immunity standard in affirming summary judgment in favor of police officers with respect to illegal search claim under state civil rights act); Duarte v. Healy, 537 N.E.2d 1230, 1232 (Mass. 1989) (adopting federal qualified immunity standard with respect to claims under state civil rights act); EIC Dev., LLC v. Mystic Valley Dev. Comm'n, 2003 WL 1702531 (Mass. Super. Ct. 2004) (applying Harlow qualified immunity standard in determining state law claim of intentional interference with contractual or business relations). In Foster v. McGrail, 844 F.Supp. 16, 29 (D.Mass. 1994), the court concluded that Massachusetts would extend the federal qualified immunity standard specifically to a state law battery claim against a correctional officer because: "Concerns about the impact of rules of liability on the performance of the duties of public officials do not vary because liability is claimed on a theory of battery rather than on a theory of violation of civil rights."

Even states not yet adopting the federal doctrine of qualified immunity have long afforded some other form of common law or

statutory immunity to police officers and/or other public officials. The precise contours of the immunity vary from state to state, but, generally, the principal difference between that immunity and federal qualified immunity is that those states utilize a subjective good faith requirement instead of or in addition to Harlow's requirement of objective reasonableness. See e.g. Bailey v. Kennedy, 349 F.3d 731, 742 (4 th Cir. 2003) (no immunity under North Carolina law for acts committed with "malice or corruption" (citing Grad v. Kaasa, 321 S.E. 2d 888, 890 (N.C. 1984)); Russoli v. Salisbury Twp., 126 F.Supp. 2d 821, 868 (E.D. Pa. 2000) (under Pennsylvania law, a police officer is not immune from an assault and battery claim if he "knew that force used was not reasonable under the circumstances" (emphasis added)); Samaniego v. City of Kodiak, 2 P.3d 78,84 (Alaska 2000) (holding officers immune from state law excessive force / assault claims if force was used in subjective good faith and was "objectively reasonable" under Harlow qualified immunity standard); Shoemaker v. Smith, 725 A.2d 549, 560 (Md. 1999) (actual malice or gross negligence defeats qualified immunity under Maryland law); Mulligan v. Rioux, 643 A.2d 1226, 1233-1234 (Conn. 1994) (no immunity under Connecticut law for acts "involv[ing] malice, wantonness or intent to injure"); Rico v. State, 472 N.W.2nd 100, 107 (Minn. 1991) (no official immunity under Minnesota law for "willful or malicious wrong[s]").

In this case, even if Rhode Island engrafted a "good faith" requirement on the federal doctrine of qualified immunity, Jones would be shielded from liability because there is no evidence that would support a finding that Jones acted in bad faith.

**Conclusion**

This is not a case in which a police officer gratuitously used physical force under circumstances that did not justify the use of force. Nor is this a case in which a police officer acted as a self appointed judge, jury and executioner by meting out his own version of corporal punishment for some perceived violation or affront. Nor is this a case in which the use of force was warranted but the force used clearly was far in excess of permissible levels. Obviously, those kinds of conduct could not be tolerated and the doctrine of qualified immunity would not protect the officer from liability in any of those cases.

Rather, this is a case in which the plaintiff's own conduct in resisting arrest justified the use of physical force and force was applied, solely, for the purpose of subduing him. Moreover, while arguably, there may be room for disagreement regarding whether the level of force used was appropriate, this is not a case in which the force clearly was excessive. On the contrary, it clearly was objectively reasonable for Jones, at least, to have believed that the force used was lawful. Thus, this is precisely the type of "'close case'" in which the doctrine of qualified immunity affords a "'wide zone of protection,'" Swain, 117 F.3d at 9 (quoting Roy,

42 F.3d at 695), that shields an officer from liability as long as he acts in an "objectively reasonable" manner. Accordingly, while it is very regrettable that Jennings suffered a broken ankle, Jones cannot be held liable for that injury.

For all of the foregoing reasons, Jones' Motion for Judgment as a Matter of Law on Counts VIII and XIV is hereby granted.

IT IS SO ORDERED:

Ernest C. Torres

Ernest C. Torres
Chief Judge

Date: August 24, 2005