**UNITED STATES DISTICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| **ADAM JENNINGS,** | : | |
| **Plaintiff** | : | **C.A. No. 03-572ML** |
| **v.** | : | |
| | : | |
| | : | |
| **KENNETH JONES,** | : | |
| **Defendant** | : | |

**OBJECTION TO PLAINTIFF'S MOTION IN LIMINE**

Now comes Defendant Kenneth Jones and objects to Plaintiff's "Motion in Limine for Permission to Present Kevin Robishaw as a Witness For the Plaintiff." A Memorandum in support hereof is attached.

Respectfully Submitted,

Defendant,
By His Attorney,

PATRICK C. LYNCH
ATTORNEY GENERAL

*/s/ Rebecca Partington*
*/s/ John Moreira*

Rebecca Tedford Partington # 3890
Deputy Chief--Civil Division
John Moreira # 7371
Special Assistant Attorney General
150 South Main Street
Providence, RI 02903
Tel. (401) 274-4400
Fax (401) 222-2995

**CERTIFICATION**

I, the undersigned, hereby certify that I have filed the within Objection to Motion in Limine via the ECF System and that it is available for viewing and downloading and that I have caused a copy to be sent to the Attorney of Record listed below on this 8th day of July, 2008.

/s/ *Rebecca Partington*

**Charles M Bradley**
bradley39@earthlink.net

**UNITED STATES DISTICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| **ADAM JENNINGS,** <br> **Plaintiff** <br> **v.** <br><br> **KENNETH JONES,** <br> **Defendant** | : <br> : <br> : <br> : <br> : <br> : <br> : | **C.A. No. 03-572ML** |

**<u>MEMORANDUM IN SUPPORT OF</u>**
**<u>OBJECTION TO PLAINTIFF'S MOTION IN LIMINE</u>**

In a Motion filed on July 1, 2008 Plaintiff requests leave from this Court to present a new witness at the trial of this matter, scheduled to begin on July 22. Jones objects, as the Motion is devoid of merit. Initially, counsel admits that Robishaw was not on the plaintiff's witness list at the first trial of this matter. Further, Robishaw was not disclosed during discovery, even though Jones asked for the names of people with knowledge of the incident, and for the names of potential witnesses at trial. By order of this Court, discovery closed in this case on October 1, 2004. Plaintiff has not moved to reopen discovery.

The purpose of setting time limits on discovery is to assure both sides the "opportunity immediately before trial to engage in orderly, final trial preparation, uninterrupted by a flurry of 'Midnight' discovery." *Gagne-Fusco v. General Motors Corp.,* 804 F.Supp. 404 (D.N.H. 1992). To allow the Plaintiff to add Robishaw as a trial witness would disrupt this process. In a similar context, the First Circuit has described a showing of "newly discovered evidence" sufficient to reopen or reconsider proceedings as (1) evidence that has been discovered since the trial; (2) evidence that could not by due

diligence have been discovered earlier by the movant; (3) evidence that is not merely cumulative or impeaching; and (4) evidence that is of such a nature that it would probably change the result were a new trial to be granted. *United States Steel v. M.Dematteo Constr. Co.*, 315 F.3d 43 (1st Cir. 2002).

Plaintiff does not indicate with any specificity the subject matter of Robishaw's testimony. Nor does he allege necessity or state that he would be prejudiced if Robishaw is not allowed to testify, or, most importantly, he does not explain why Robishaw was not known to him earlier. The most glaring flaw in the Motion is counsel's representation that "he was not aware of Kevin Robishaw's observance of the arrest of Adam Jennings until the first trial of this matter had concluded". That statement is simply incredible, since Mr. Robishaw was mentioned during the testimony of Dan Piccoli on March 22, 2005. Piccoli testified that he was with Mr. Robishaw at the smoke shop on July 14, 2003 (March 22, 2005 transcript, pgs. 20-22).[1] With a minimal amount of investigation, Plaintiff could have determined prior to the first trial that Mr. Robishaw accompanied Piccoli to the smoke shop and what if anything Mr. Robishaw observed.

Plaintiff also should have been aware of Mr. Robishaw because he testified in August of 2003 alongside Piccoli before the Simmons Commission. Piccoli confirmed as much in his trial testimony (March 22, 2005 transcript, pgs. 68-69). A videotape of Piccoli's testimony before the Simmons Commission was marked for identification at the first trial as Exhibit CC. Robishaw is shown seated next to Piccoli for part of that videotape, as Piccoli noted. (Exh. A, pg. 68). This videotape was viewed during the trial while both Plaintiff and counsel were in the courtroom--the transcript indicates that an

---

[1] Cited portions of the March 22, 2005 transcript are appended hereto as Exhibit A.

extra copy of Exhibit CC was made and shown to Mr. Bradley prior to watching it in court. (March 22, 2005 Transcript, pg. 58). Finally, Mr. Bradley admitted to the Court that he had seen it. (March 22, 2005 Transcript, pg. 69) .

Not only does the above make it clear that Robishaw was ***in fact*** known to the plaintiff at least three years ago, with a minimal amount of effort, such as watching media reports of the incident and subsequent investigation, he would have also been known to the Plaintiff in 2003. In 2003, Robishaw gave a statement to the Simmons Commission investigating the July 2003 incident, and stated that "all's we seen was you know the woman and I think her son, the one that had his ankle broke, um, that was it." (Trial Exh. CC at trial). In conjunction with this statement, his name was featured in media coverage after the July, 2003 incident. His photograph was featured in a Providence Journal article on September 10 entitled (appropriately) "Ready to Testify". The description under the photograph read "Dan Piccoli, of Warwick, left, and Kevin Robishaw, of Coventry, wait to address the Independent Review Commission yesterday at Brown University. They were at the smoke shop during the state police raid." (Archived article, Exh. B).

Dan Piccoli has been deemed not credible by J. Torres in his decision of August 24, 2005 (slip. op. at 6). This appears to be an attempt to substitute one incredible witness for another.[2] In his decision granting Jones' Motion for a New Trial, J. Torres elaborated:

> The evidence that Jones increased the force exerted on Jennings' ankle consisted of testimony by Domingo Monroe, Daniel Piccoli and Jennings, himself. However, neither Monroe nor Piccoli was in any position to observe Jones' actions or what was taking place during the struggle

[2] Should the Court deem it necessary to access Robishaw's relevance, Jones requests the opportunity to view the videotape of the incident and point out Robishaw's remoteness to the Jennings incident.

> between Jennings and the troopers. The videotape shows a mass of bodies obscuring any view that Monroe or Piccoli could have had of what the participants in the struggle were doing, or, more specifically, what Jones was doing to Jennings' ankle. Monroe was seated across the room behind a counter and the videotape shows two officers standing directly in front of him as well as two other officers in between Monroe and where the struggle was taking place.
>
> The videotape also shows that, just before the struggle began, Piccoli was in the middle of the parking lot; that Jones' back was toward the deck outside the door to the smoke shop where Piccoli claimed to be standing and that, from the deck, any view of what Jennings and/or Jones were doing would have been obstructed by the presence of a camera man and state troopers between the entrance to the smoke shop and the location of the struggle. Doubts regarding Piccoli's ability to have observed what happened are reinforced by his previous testimony before a commission investigating the incident that the struggle occurred ***outside*** the smoke shop.

*Jennings v. Jones,* 2008 WL 2202429 (May 27, 2008, slip. op. at 3).

Plaintiff should not be allowed to add this witness of questionable relevance at the twelfth hour, since he was *in fact* known to the Plaintiff, and since to allow the testimony would necessitate additional research, discovery and expense. If Robishaw is allowed to testify, Jones would request a continuance of the trial.

Because Plaintiff has not established that the potential testimony of Mr. Robishaw is newly discovered evidence, the instant Motion is clearly groundless and should be denied.

Respectfully Submitted,

Defendant,
By His Attorney,

PATRICK C. LYNCH
ATTORNEY GENERAL

*/s/ Rebecca Partington*
*/s/ John Moreira*

Rebecca Tedford Partington # 3890
Deputy Chief--Civil Division
John Moreira # 7371
Special Assistant Attorney General
150 South Main Street
Providence, RI 02903
Tel. (401) 274-4400
Fax (401) 222-2995

**CERTIFICATION**

I, the undersigned, hereby certify that I have filed the within Memo in Support of Objection to Motion in Limine via the ECF System and that it is available for viewing and downloading and that I have caused a copy to be sent to the Attorney of Record listed below on this 8th day of July, 2008.

/s/ *Rebecca Partington*

**Charles M Bradley**
bradley39@earthlink.net

# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

* * * * * * * * * * * * * * * *

PAULLA DOVE JENNINGS, ET AL., Plaintiffs,

VS.

STATE OF RHODE ISLAND, ET AL., Defendants.

* * * * * * * * * * * * * * * *

C.A. NO: 03-572T

MARCH 22, 2005

10:00 A.M.

PROVIDENCE, RI

BEFORE THE HONORABLE ERNEST C. TORRES

CHIEF DISTRICT JUDGE

**(JURY TRIAL)**

APPEARANCES:

FOR THE PLAINTIFFS: Charles M. Bradley, Esquire
39 Grove Avenue
Westerly, Rhode Island 02891

FOR THE DEFENDANT: Rhode Island Attorney General's Office
By: Rebecca Partington, Esquire
by: Amy Vignali Coleman, Esquire
150 South Main Street
Providence, RI 02903

Court Reporter: Angela M. Reynolds, RPR-FCRR
One Exchange Terrace
Providence, RI 02903

A. It was like his teeth, like grinning, you know what I mean? Like, do you know what I'm saying, like grinning his teeth.

THE COURT: Did you say "gritting" or "grinning?"

THE WITNESS: Well, you know, like if you're trying to open something and it won't, you know what I'm saying.

THE COURT: Gritting the teeth?

THE WITNESS: Yeah.

Q. What, if anything, did Adam Jennings say in response? Withdrawn.

What, if anything, did you hear from Adam Jennings in response?

A. I heard him scream.

MR. BRADLEY: I don't have any other questions.

**CROSS-EXAMINATION**

**BY MS. PARTINGTON:**

Q. Good morning, Mr. Piccoli.

A. Good morning.

Q. My name is Rebecca Partington, I'm an Assistant Attorney General, I represent the defendants in this case. You went to the Smoke Shop on July 14, 2003 to buy cigarettes; correct?

A. Yes.

Q. It was a Monday; right?
A. I guess. I don't know.
Q. You wouldn't argue with me that it was a Monday?
A. Okay.
Q. That's about 20 to 25 miles away from where you live; right?
A. Approximately.
Q. And they didn't have the brand you wanted so you waited around for a while, didn't you?
A. Yes.
Q. You waited around about three-and-a-half hours; correct?
A. Yes.
Q. With your friend, Kevin Robishaw?
A. Yes.
Q. At that time you were a smoker; right?
A. Yes.
Q. Do you still smoke?
A. Yes.
Q. And you thought it was a really great deal that you could get these cigarettes at the Smoke Shop without paying taxes; correct?
MR. BRADLEY: Objection.
THE COURT: Sustained.
Q. At the Smoke Shop that day, specifically right

before the uniformed troopers arrived, okay, can you put yourself at that point, there was a big T.V. van out front, wasn't there?
A. Well, I don't know.
Q. And there were -- well, you don't know. But you wouldn't argue with me if, say, your friend Kevin / Robishaw has testified to that, hasn't he?
MR. BRADLEY: Objection, your Honor.
THE COURT: Sustained.
Q. There were T.V. reporters in the parking lot, weren't there?
A. I don't remember. I don't remember.
Q. There were a lot of people in the parking lot, weren't there?
A. Yes, there were a lot of people, yes.
Q. You saw some still photographers in the parking lot?
A. No.
Q. Did you see a Rhode Island State Police cameraman walking around?
A. No.
Q. And you are testifying you didn't see any T.V. camera people in the parking lot?
MR. BRADLEY: Objection, that's not his testimony.

MS. PARTINGTON: No, your Honor, I received it at 4:30 on Friday myself, and was not aware that Mr. Piccoli was going to testify inconsistent with what he said to the Brown Commission.

THE COURT: All right, so Mr. Bradley hasn't had a chance to see that?

MS. PARTINGTON: He doesn't have one. I have made an extra one that I can show him at the break.

THE COURT: Okay, I think under those circumstances, then, first Mr. Bradley should have an opportunity to see the video, and we may have to call Mr. Piccoli back after all, but we'll deal with that when we get him back on the stand.

Now, we're in the middle of the testimony of Mr. Monroe, and I guess the question is whether we interrupt that to put Mr. Piccoli back or whether we finish with Mr. Monroe's testimony. How much longer do you have to go with Mr. Monroe?

MR. BRADLEY: Not very long, five or ten minutes.

MS. PARTINGTON: Very minimal, your Honor.

THE COURT: All right, we'll finish up with Mr. Monroe, then, and then we'll recall Mr. Piccoli after we finish. We'll take a very brief recess, mainly for the benefit of the court reporter, and we'll

THE COURT: All right.
Q. Mr. Piccoli, can you see the video on your screen?
A. Yes.
Q. Is that you on the right of that screen?
A. Yes.
Q. Is that your name on the little tag in front of you, "Dan Piccoli"?
A. Yes.
Q. And is that your friend Kevin Robishaw to the left of you?
A. Yes.
Q. So now you remember that you testified before the Brown Commission; correct?
A. Yes.
Q. Do you recall that you were asked the question concerning an ankle breaking that you saw? A woman asked you, "Did this happen inside or outside?" And your response was, "It was outside in the parking lot," do you remember giving that answer?
A. No.
MS. PARTINGTON: Your Honor, at this point I would ask that the video be published to the jury and the witness in the same way that his deposition testimony was shown to other witnesses.
MR. BRADLEY: I object, your Honor.

THE COURT: I think we've gone over this at the morning recess, Ms. Partington. You may have the opportunity to play it, but first Mr. Bradley is going to have to see it.

MR. BRADLEY: Your Honor, I have seen the video.

THE COURT: You have seen the video?

MR. BRADLEY: I have seen the video.

THE COURT: Well, thank you for your candor, then. What is your objection?

MR. BRADLEY: My objection is that Mr. Piccoli has not had an opportunity to see it as he would have an opportunity if it were a deposition transcript.

THE COURT: I see. In that case the objection is overruled and the clerk will play the video for the jury and for Mr. Piccoli.

(Brown University Commission Videotape Shown)

Q. Mr. Piccoli, does that refresh your recollection you saw a man outside the parking lot getting his ankle getting broken?

A. Well, now that I've seen this, I was outside, but the woman outside -- this is very confusing to me now, because like I've said, the woman was outside, the man, he was inside, I was outside.

Q. Thank you, Mr. Piccoli.

A. But, I mean, as far as the woman is concerned, too,

# EXHIBIT B

Tribal officials say raid at smoke shop needless

[All Edition]

The Providence Journal - Providence, R.I.

| | |
|---|---|
| Author: | SCOTT MacKAY Journal Staff Writer |
| Date: | Sep 10, 2003 |
| Start Page: | B.01 |
| Section: | News |
| Text Word Count: | 930 |


**Document Text**

* "We could have been in federal court instead of in a parking lot," Jack Killoy, the Narragansett Indians' lawyer, tells the Independent Review Commission studying the July 14 raid.

* * *

PROVIDENCE - Narragansett Indian tribe officials yesterday said that federal court action - not a state police raid - would have been the proper way for Governor Carcieri and Atty. Gen. Patrick Lynch to have dealt with the July dispute over the tribe's sale of tax-free tobacco on its tribal land in Charlestown.

Jack Killoy, the tribe's lawyer, told the Independent Review Commission studying the July 14 raid - which turned into a televised shoving match in a parking lot near the smoke shop between tribe members and the police - that the raid should never have occurred.

"In hindsight, other alternatives could have been taken," said Killoy, saying the state should have pushed harder to take the matter to federal court or to federal agencies, such as the Bureau of Alcohol, Tobacco and Firearms or the U.S. Attorney's office, whose authority the tribe would have recognized.

The tribe, upset that the Rhode Island General Assembly and Governor Carcieri refused to support a referendum for an Indian casino, opened the smoke shop, selling cigarettes without charging the state's $1.72-per-pack tax.

"We could have been in federal court instead of in a parking lot," Killoy said. He noted that the dispute has ended up in federal court anyway, where a decision is pending before U.S. District Court Judge William Smith.

"We could have ended up where we are today without the threat of violence or of putting police, customers and tribal members in harm's way," said Killoy in a brief interview after his testimony.

Killoy also gave the review commission a tape from a security camera inside the smoke shop that he said shows that the state police never showed any warrants to tribal officials.

Governor Carcieri ordered the state police on July 14 to raid the tribe's tax-free tobacco shop - two days after it opened. The police, acting on a search-and-seizure warrant issued by a state judge, met resistance from the Narragansetts, whose leaders assert that in dealing with a federally recognized tribe, the state had no authority to close the smoke shop.

As TV cameras rolled and reporters watched, the police scuffled with tribe members. Seven adults and one juvenile were arrested. Carcieri and the state police came under heavy criticism from civil- rights organizations after the incident.

Carcieri appointed the review commission in the aftermath of the uproar over the action. The panel's chairwoman is Brown University President Ruth Simmons, who has been the most persistent questioner during four sessions, which have all been held on the Brown campus.

Besides Simmons, the panel includes retired state Superior Court Judge Eugene Gallant; Rabbi Leslie Gutterman of Temple Beth-El in Providence; Jacqueline Johnson, executive director of the Washington, D.C.-based National Congress of American Indians; the Rev. Matthew Kai, executive minister of the Ministers Alliance of Rhode Island; and Rear Adm. Barbara McGann, president of the Rhode Island chapter of the American Red Cross.

In testimony last month, state officials maintained that agreeing to take a federal route could have hurt their legal position - which is that selling tax-free cigarettes clearly violates state law.

Tribal officials in yesterday's testimony said they, too, could not give in to respecting a state-issued warrant, because it would have signaled that the Narragansetts believe they are under state control.

The tribe asserts that because it is a federally recognized Indian tribe, the state does not have authority to enforce its tobacco tax laws on the 1,800 acres of tribal land in Charlestown.

Lt. Rodney Champlin, acting chief of the tribal police force, said the state police never showed him a state warrant, but that it would not have mattered if they had.

"The tribe and the tribal police would only accept a federal warrant," said Champlin, who said he informed the state police of the tribe's position the day before the raid.

The state police have maintained that they did not use undue force and that had the Narragansetts not physically resisted the police from confiscating the cigarettes, there would have been no shoving match.

Gallant questioned Champlin about the resistance. "We weren't resisting, we were protecting our lands," replied Champlin. "We had every right to open up the smoke shop.

"We weren't being disorderly, we were protecting what was ours," Champlin said.

When the state police grabbed tribal Chief Sachem Matthew Thomas, Champlin said he "tried to get them off my chief sachem."

When asked whether he tried to quell the resistance, Champlin said, "I did try to calm them down, but when people are angry ... there wasn't much I could do."

* DIGITAL EXTRA: Look back at coverage of the raid on the Narragansett Indian smoke shop and its aftermath, at:

http://projo.com/extra/2003/smokeshop/

* * *

* READY TO TESTIFY: Dan Piccoli, of Warwick, left, and Kevin Robishaw, of Coventry, wait to address the Independent Review Commission yesterday at Brown University. They were at the smoke shop during the state police raid.

* WITNESS: Lt. Rodney Champlin, acting chief of the tribal police force, talks to the media yesterday after appearing before the commission studying the July 14 raid. "We weren't resisting," he told the panel, "we were protecting our lands."

JOURNAL PHOTOS / GRETCHEN ERTL

* AT BROWN: Chief Sachem Matthew Thomas, left, and Lt. Rodney Champlin, acting