View Federal District Court Opinions

MILLER v. LEWIS, (N.D.Ill. 2005)

RONALD MILLER, Plaintiff, v. SPECIAL AGENT CHRIS LEWIS, Individually, and HARRAH'S ILLINOIS CORPORATION, Defendants.

No. 03 C 0297.

United States District Court, N.D. Illinois, Eastern Division.

August 9, 2005

**MEMORANDUM OPINION AND ORDER**

MARK FILIP, District Judge

Plaintiff Ronald Miller ("Miller" or "Plaintiff") is suing Defendants, Special Agent Chris Lewis ("Lewis") and Harrah's Illinois Corporation ("Harrah's") (collectively "Defendants"), for alleged violations of his constitutional rights that occurred during Miller's arrest at a casino. (D.E. 20 (Third Am. Compl.) ("Compl.").)**[fn1]** Miller alleges that Lewis falsely arrested him (Count I) and subjected him to excessive force during that arrest (Count II). Miller also alleges that Harrah's actions in detaining Lewis and obtaining from him an alleged overpayment constituted false imprisonment, fraud, and extortion (Count III). The case is before the Court on Lewis's and Harrah's motions for summary judgment. (D.E. 42, 43.) For the reasons stated below, the Court grants Harrah's motion, and grants in part and denies in part Lewis's motion.

## I. Background[fn2]

Harrah's operates an manages a casino, Harrah's Casino Joliet ("Harrah's Casino"). (Lewis SF ¶ 3.) Ronald Miller, a 57-year old man at the time of the incident at issue, was patronizing Harrah's Casino on May 5, 2002. (*Id.* ¶¶ 1, 7.) Lewis is a law enforcement officer with the Illinois Gaming Board ("IGB"), and he too was 57 years old. (*Id.* ¶¶ 2, 8.) On May 5, 2002, Lewis was acting within the scope of his employment as a Riverboat Agent assigned to Harrah's Casino. (*Id.*)

On May 5, Miller won approximately $13,000 at the craps table at Harrah's Casino. (Harrah's SF ¶ 1.) Miller went to the pay window to exchange his winnings by paying down approximately $9,000 in "markers," and by retaining the balance, or approximately $4,600 in cash. (*Id.* ¶ 2.) Miller did not count his chips, and thus did not know the exact amount of money he was due after completing the transaction. (*Id.* ¶¶ 3, 4.) He relied on Harrah's to properly exchange cash for chips. (*Id.* ¶ 4.) Miller tendered chips to the cashier to pay off his markers, and the cashier informed him that he would need to tender another

$500 because he had turned in only $8,500 in chips for $9,000 in markers. (Pl. SAF ¶ 3.) Miller then gave the cashier chips totaling what he believed to be $500. (*Id.*) Miller then went to the craps table to see a Harrah's employee about getting a "comp ticket." (Pl. SAF ¶ 5.) On the way to the craps table, Miller was approached by a Harrah's representative who told him that he owed Harrah's $500. (*Id.* ¶ 6; Harrah's SF ¶ 6.) Miller informed the Harrah's representative that he had already paid and walked away. (Pl. SAF ¶ 6; Harrah's SF ¶ 7.) Miller played a few games of craps and returned to the cashier's window to cash out his winnings. (Pl. SAF ¶ 7.) He received a comp ticket and headed to a part of the casino called Club Cappuccino. (*Id.*)

During this time, Joan Lopez, Harrah's cage shift manager, was informed that there had been a $500 overpayment to Miller and that Miller was now leaving the cage area. (Harrah's SF ¶ 8.) When a cashier reports an overpayment to her supervisor or manager, the overpayment is confirmed by contacting the video camera surveillance department and by a count down of the cashier's drawer. (Lewis SF ¶ 22.) If a patron refuses to repay the overpayment, the patron will be evicted from the casino and theft charges could be brought against him. (*Id.* ¶ 23.) Harrah's may also take care of an overpayment through a collection agency. (Pl. Resp. to Lewis SF ¶ 23.)

Ms. Lopez confirmed with surveillance that there had been an overpayment and then called Harrah's security to be present when she approached Miller about the overpayment. (Harrah's SF ¶ 9.) Ms. Lopez also went to the cashier who had made the alleged overpayment, where the cashier "counted down" her drawer and verified that she was $500 short. (*Id.* ¶ 10.)

At approximately 2:00 p.m., Defendant Lewis received a call from a Harrah's manager requesting that he join her to question a guest about an overpayment. (Lewis SF ¶ 21.) On his way to meet the manager, Lewis received a call from surveillance, and Lewis was given the guest's physical description, his approximate location, and the name, Ronald Miller. (*Id.*) Lewis entered the hallway/corridor headed toward Club Cappuccino and walked past other patrons until he was behind a patron matching Miller's description. (*Id.* ¶¶ 24, 25.) At about the same time, Frank Tyse, a security supervisor for Harrah's, received instructions from his supervisor to locate a patron and determine if he was going to return an overpayment from the high limit cage. (*Id.* ¶ 18.) Mr. Tyse also received a radio call from surveillance, and he was given a description of the patron and the patron's location in the casino. (*Id.* ¶ 19.) Tyse ultimately arrived in the corridor where Lewis was following Miller, and Tyse shared this information with Lewis. (*Id.* ¶¶ 19, 25.)

Lewis and Tyse were walking behind Miller and called out his name. (Lewis SF ¶ 28.) As Plaintiff was walking down the corridor to Club Cappuccino, he heard someone call out "Miller." (Pl. SAF ¶ 12.) Plaintiff turned around, and when he did not recognize anyone, he continued to walk toward the coffee shop. (*Id.*; Lewis SF ¶ 29.) Miller turned around again after he heard his name called a second time and Lewis and Tyse had caught up with him. (Lewis SF ¶ 30; Pl. SAF ¶ 15.) Plaintiff recalls only seeing Tyse approach him at this time. (Pl. Resp. to Lewis SF ¶ 30.)



07/20/2008 23:32 FAX 4015961327 ATTORNEY MICHAEL BRADLEY ☑003

Plaintiff appreciated that Tyse (whose name he did not know) was a casino

employee because of the ID he was wearing, but Plaintiff did not know (at least according to Plaintiff) that Tyse was a security officer. (Pl. SAF ¶ 15.) Tyse told Miller that he owed the casino $500.[fn3] (Pl. Resp. to Lewis SF ¶ 31.) Miller denied having the overpayment, turned and walked away. (Lewis SF ¶ 32; Pl. SAF ¶ 17.) According to Miller, he still had not seen Lewis at this point. (Pl. Resp. to Lewis SF ¶ 32.) Miller reversed his direction and walked the other way — *i.e.*, away from Tyse and Lewis. (Lewis SF ¶ 33.)

By way of context, a videotape from the casino that the parties have provided reveals that the three men were not in the main gaming area at this point in time or in proximity to it. Instead, the three men were in a corridor area that apparently runs from the gaming area to other areas, such as the Club Cappuccino, and on the videotape they are few, if any, other people depicted in the relevant portion of the corridor area. (*See* Videotape at approximately 14:08:45.)

At this point, Lewis put his right hand on Miller's left upper arm. (Lewis SF ¶ 34.) Miller characterizes this action as Lewis pinching his arm.[fn4] (Pl. SAF ¶ 19.) Miller states that neither Tyse nor Lewis had identified himself at this point (Pl. SAF ¶ 20; *see* D.E. 50, Ex. 1 (Miller Dep.) at 39, 40), which Lewis and Harrah's dispute (Lewis Resp. to Pl. SAF ¶ 20; Harrah's Resp. to Pl. SAF ¶ 20). (For example, Lewis contends that he identified himself at least

once and perhaps twice as a police officer with the Gaming Board. (*E.g.*, D.E. 42, Ex. 3 (Lewis Dep.) at 68, 74.)) Plaintiff told Lewis to get his hands off him. (Pl. SAF ¶ 22; *see also* D.E. 42, Ex. 9 (Miller Dep.) at 46 ("Okay. I say, `Get your fucking hands off of me right now.'").) Lewis did not release Miller but instead allegedly squeezed his arm harder. (Pl. SAF ¶ 22.)

The parties dispute exactly what happened at this point in the altercation. Lewis states that Miller pushed him away and that Lewis stumbled back. (Lewis SF ¶¶ 35, 36.) Miller initially testified that he pushed Lewis (*see* D.E. 42, Ex. 9 (Miller Dep.) at 33 ("And at that particular point I push him away from me")), but after reviewing the video surveillance tape of the incident, Miller testified that he only pulled away from Lewis. (*See* Miller Dep. at 48-49; *see also* Pl. SAF ¶ 23 (Miller pulled away from Lewis).) The Court has reviewed the video surveillance tape submitted by Lewis as an exhibit to his summary judgment motion. (Lewis SF, Ex. 4a.) The video does not definitively show whether Miller pushed Lewis or whether he merely pulled away from Lewis. What is clear from the video, however — and undisputed by the parties — is that Miller and Lewis were physically engaged for a brief period of time (seconds) which terminated as Miller disengaged from Lewis — either by pushing (Lewis's view) or pulling away in a shrugging sort of fashion (Miller's view). It is further undisputed that Miller then assumed a physical posture with his arms and hands raised toward Lewis — what the parties have characterized as a "defensive stance."[fn5] (Lewis SF ¶ 37; Pl. SAF ¶ 26; Lewis Resp. to Pl. SAF ¶

26.)

As Miller disengaged from Lewis and got into his stance, Lewis drew his firearm, unlocking the safety as he did so, and pointed it at Miller. (Lewis SF ¶ 38; Pl. SAF ¶¶ 27, 28.) Lewis did not observe any weapons on Miller before drawing his firearm. (Pl. SAF ¶ 30.) Miller dropped his hands and abandoned the physical stance after Lewis drew his firearm. (Lewis SF ¶ 39; Pl. SAF ¶ 32; Videotape at approximately 14:08:57.) As explained (*see* footnote 5, *supra*) the period of time that Miller was in any altercation-ready stance and that Lewis was pointing any weapon at Miller was approximately four seconds (*see id.*; Videotape at approximately 14:08:54 to approximately 14:08:57). The parties' factual submissions state that Miller and Lewis were both 57 years old. (Lewis SF ¶¶ 7-8.) Tyse's age does not appear to be documented, although he too is a retired Chicago Police Officer who serves as a security supervisor at Harrah's. (*Id.* ¶ 11.) Plaintiff asserts that Lewis is 5'10"-5'11" and weighs approximately 200 pounds, and that Tyse is 6' and weighs approximately 220 pounds (Pl. SAF ¶ 47); the videotape reveals that Plaintiff is, at a minimum, of similar size, and all three men move and appear to be in robust and non-frail physical condition, at least from external appearances on the tape. (*See* Videotape.)

After Miller abandoned his physical stance and Lewis lowered his firearm, Lewis, who was then holding his firearm pointed downward at his side and not at Miller, grabbed Miller by the front of his shirt. (Pl. SAF ¶ 33; Videotape at approximately 14:08:58.) At this time, Miller

acknowledges that Lewis moved his jacket aside to display his badge and that Miller heard Lewis state that he was employed by the IGB. (*Id.*)

Lewis reholstered his firearm and handcuffed Miller, placing him under arrest for battery. (Lewis SF ¶ 40; Pl. SAF ¶ 34.) Glen Santos, an off-duty Joliet police officer working as added security in the casino, joined Lewis and Tyse after Miller was handcuffed. (Lewis SF ¶¶ 12, 43; Pl. SAF ¶ 36.) Miller was then taken to the IGB office. (Lewis SF ¶ 44; Pl. SAF ¶ 37.) After reviewing the video recording of the incident, Officer Santos issued a compliance ticket (unexplained) to Miller for battery to Lewis. (Lewis SF ¶ 45; Pl. SAF ¶ 43.)

While in the IGB office, Miller spoke with a Harrah's representative about the alleged overpayment. (Harrah's SF ¶ 13.) Miller was advised that he owed Harrah's $500, and that the videotape confirmed the overpayment. (*Id.* ¶ 14; Pl. SAF ¶ 38.) Harrah's denied Miller's request to see the video confirming the overpayment. (Pl. SAF ¶¶ 38, 39.) Miller continued to tell Harrah's that he disputed the overpayment. (*Id.* ¶ 40.) Harrah's told Miller that if he did not tender the $500, he would be taken down to the station, printed, and arrested for theft. (*Id.* ¶ 41.) Although Plaintiff disputed that he owed the money, Plaintiff tendered the $500 to Harrah's. (*Id.*; Harrah's SF ¶ 46; Lewis SF ¶ 46.) Miller was evicted from Harrah's after being detained in the IGB office for less than an hour. (Lewis SF ¶¶ 49, 50; Pl. SF ¶ 42 (thirty to forty-five minutes).) Ms. Lopez

returned to the cashier the $500 obtained from Miller, after which the cashier's drawer balanced. (Harrah's SF ¶ 16.)

## II. Summary Judgment Standard

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The nonmovant cannot rest on the pleadings alone, but must identify specific facts, *see Cornfield v. Consol. High Sch. Dist. No. 230*, 991 F.2d 1316, 1320 (7th Cir. 1993), that raise more than a scintilla of evidence to show a genuine triable issue of material fact. *See Murphy v. ITT Educ. Servs., Inc.*, 176 F.3d 934, 936 (7th Cir. 1999) (citation omitted). The Court views the record and all reasonable inferences drawn therefrom in the light most favorable to the nonmovant. *See* Fed.R.Civ.P. 56(c); *Foley v. City of Lafayette*, 359 F.3d 925, 928 (7th Cir. 2004).

## III. Discussion

### A. Defendant Lewis's Motion for Summary Judgment

Defendant Lewis moves for summary judgment on the false arrest claim on the grounds that Lewis had probable cause to arrest Miller, and therefore, he did not violate Miller's Fourth Amendment rights. (D.E. 42 (Lewis Mot.) at 3-6.) Lewis moves for summary judgment on the excessive force claim on the grounds that his use of force was objectively reasonable. (*Id.* at 6-9.) Lewis also argues that he is entitled to qualified immunity for his actions during the incident at issue. (*Id.* at 9-11.) As explained below, the first two inquiries are encompassed by an analysis of whether Lewis is entitled to qualified immunity.

"Police officers are entitled to qualified immunity for actions taken during a stop or arrest insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Smith v. City of Chicago*, 242 F.3d 737, 742 (7th Cir. 2001) (internal quotations omitted). In determining whether an officer is entitled to qualified immunity, "the first inquiry must be whether a constitutional right would have been

violated on the facts alleged." *Saucier v. Katz*, 533 U.S. 194, 200 (2001). If no constitutional right has been violated, that is the end of the qualified immunity analysis. *See id.* at 201. If a violation could be made out on the undisputed facts taken in the light most favorable to the plaintiff, the next step "is to ask whether the right was clearly established." *Id.* In making an assessment of qualified immunity in the context of summary judgment, the Seventh Circuit teaches that the nonmovant's version of disputed facts must be taken as true. *See, e.g., Payne v. Pauley*, 337 F.3d 767, 775 (7th Cir. 2003) (collecting cases); *Morfin v. City of East Chicago*, 349 F.3d 989, 1000 n. 13 (7th Cir. 2003). Precedent makes clear that "the doctrine of qualified immunity leaves `ample room for mistaken judgments' by

police officers." *Payne,* 337 F.3d at 778 (quoting *Malley v. Briggs,* 475 U.S. 335, 341 (1986)). As explained below, the Court finds that there is a material issue of fact as to whether Lewis had probable cause to arrest Miller, which precludes summary judgment on the false arrest claim. As to the excessive force claim, however, the Court finds that the undisputed facts demonstrate that Lewis is entitled to summary judgment.

1. Count I — False Arrest

Miller claims that he was falsely arrested by Lewis. The existence of probable cause would constitute an "absolute bar" to Miller's § 1983 claim for false arrest. *Fernandez v. Perez,* 937 F.2d 368, 370 (7th Cir. 1991) (citing *Friedman v. Vill. of Skokie,* 763 F.2d 236, 239 (7th Cir. 1985)); *see also Potts v. City of Lafayette, Ind.,* 121 F.3d 1106, 1113 (7th Cir. 1997); *Saunders v. City of Chicago,* 299 F. Supp. 2d 869, 871 (N.D. Ill. 2004) (Bucklo, J.). "An officer has probable cause to arrest when the totality of the facts and circumstances within his knowledge and of which he has reasonably trustworthy information is sufficient that a prudent

person would believe that the suspect committed or was committing an offense." *Marshall v. Teske,* 284 F.3d 765, 770 (7th Cir. 2002) (citing *United States v. Sawyer,* 224 F.3d 675, 678-79 (7th Cir. 2000)); *accord United States v. Mounts,* 248 F.3d 712, 715 (7th Cir. 2001) (citing *Whren v. United States,* 517 U.S. 806, 813 (1996), and *United States v. Moore,* 215 F.3d 681, 685 (7th Cir. 2000)). The Court evaluates probable cause "not from the perspective of an omniscient observer, but on the facts as they would have appeared to a reasonable person in the position of the arresting officer." *Marshall,* 284 F.3d at 770 (citing *Mahoney v. Kesery,* 976 F.2d 1054, 1057 (7th Cir. 1992)). "So long as the totality of the circumstances, viewed in a common sense manner, reveals a probability or substantial chance of criminal activity on the suspect's part, probable cause exists." *Mounts,* 248 F.3d at 715 (internal quotation and citation omitted).

Lewis maintains that he had probable cause to arrest Miller for battery. Under Illinois law, "[a] person commits battery if he intentionally or knowingly without legal justification and by any means, (1) causes bodily harm to an individual or (2) makes physical contact of an insulting or provoking nature with an individual." 720 ILCS 5/12-3(a). "[B]attery requires that the defendant make actual physical contact with or cause harm to [the victim.]" *People v. Jenkins,* 545 N.E.2d 986, 1001 (Ill.App.Ct. 1989).

Lewis does not argue in his motion which undisputed facts demonstrate that he had probable cause to arrest Miller for battery; rather, Lewis merely recites the legal standards for the Court — which is, with all respect, a relatively unhelpful enterprise. (Lewis Mot. at 3-5.) Even in his reply brief, Lewis does not rely on the physical altercation between himself and Miller. Instead, Lewis merely states that he and Tyse tried to get Miller to stop, that Miller did not stop, and that Miller "became physically defensive toward and Illinois Gaming Board agent." (D.E. 53



07/20/2008 23:33 FAX 4015961327 ATTORNEY MICHAEL BRADLEY 007

(Lewis Reply) at 2.) With all respect to Lewis, these undisputed facts, without more, do not constitute battery. Rather, the Court looks to the physical contact that occurred between Lewis and Miller to see whether a reasonable person in Lewis's position would have reason to believe that Miller committed battery. *Marshall*, 384 F.3d at 778.

The determination of probable cause is normally a mixed question of law and fact, turning into a question of law only "when `what happened' questions are not at issue." *Smith v. Lanz*, 331 F.3d 580, 584 (7th Cir. 2003). The undisputed evidence establishes that Lewis grabbed Miller by the arm and that Miller pulled or drew away from Lewis.**[fn6]** These facts do not constitute battery because there is no evidence of intent by Miller to physically contact Lewis or to cause bodily harm to Lewis. Miller has pointed to no case, and the Court has found none, in which facts of this nature were held to constitute battery. The action that could constitute battery — the push by Miller — is disputed. Lewis says that Miller pushed him; Miller says that he merely pulled away reflexively from Lewis's grasp or pinch. (In addition, there is a second factual dispute that colors the picture: Lewis contends that he identified himself as a police officer with the Gaming Board before he took hold of Miller's arm; Miller says Lewis never identified himself before Lewis pinched Miller's arm.) The video of the incident, in the Court's view, reasonably could be interpreted to support either a characterization of Miller's disengagement as a push or a pull-back, and the videotape is silent so it is not possible to know what Lewis said about his law enforcement status. It is not the Court's place on summary

judgment to make the kinds of credibility determinations needed to resolve such evidentiary disputes — that is the province of the factfinder. *See Morfin v. City of E. Chicago*, 349 F.3d 989, 998 (7th Cir. 2003) (citing, *inter alia*, *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003)). A jury could find, of course, that Miller pushed Lewis during the altercation — in response to an inquiry and modest touch from a law enforcement officer — which could constitute probable cause for battery or battery of a law police officer. *See generally People v. Santana*, 479 N.E.2d 355, 359 (Ill.App.Ct. 1984) (evidence that defendant spit in officer's face and scuffled with officer established probable cause for battery and resisting a peace officer). But that would require the Court to accept Lewis's version of the facts, which it cannot do for the purposes of summary judgment. Thus, the Court finds that Miller has put forward evidence that creates a material issue of fact as to whether Lewis had probable cause to arrest him. *See Morfin*, 349 F.3d at 1005 n. 13 ("When, as here, the arrestee challenges the officer's description of the facts and presents a factual account where a reasonable officer would *not* be justified in making an arrest, then a material dispute of fact exists.") (emphasis in original).

Lewis next argues that even if probable cause was lacking with respect to Miller's arrest, Lewis could have believed that his actions were lawful in light of clearly established law and the circumstances presented to him. (Lewis Mot. at 10.) Lewis does not dispute that "[t]he probable cause standard — requiring that

an officer's knowledge of the facts be sufficient to warrant a prudent person in believing that the suspect had committed or was committing a crime — was clearly established at the time of the incident." *Marshall*, 294 F.3d at 772 (citing *United States v. Gilbert*, 65 F.3d 1163, 1166 (7th Cir. 1995), and *Simkunas v. Tardi*, 930 F.2d 1287, 1291 (7th Cir. 1991)). Thus, the inquiry at this stage is whether there was "any reasonable basis to suppose

there was probable cause, as that is the test for qualified immunity." *Kijonka v. Seitzinger*, 363 F.3d 645, 648 (7th Cir. 2004); *see also Edwards v. Cabrera*, 58 F.3d 290, 293 (7th Cir. 1995) ("Even if probable cause was lacking with respect to this arrest despite the officers' subjective belief that they had probable cause, they are entitled to immunity as long as their belief was objectively reasonable.").

Taking the facts in the light most favorable to Miller, *see Payne*, 337 F.3d at 770, the Court finds that the facts and circumstances within Lewis's knowledge were not sufficient to warrant a reasonable officer to believe that it was lawful to arrest Miller for battery. Miller (at least according to his account) merely pulled away from the grip and/or pinch of a man who had not identified himself as an officer. To the extent that there was physical contact between Miller and Lewis, it was initiated by Lewis through his pinch (again, at least crediting Miller's account). Common sense suggests (and Lewis has cited no contrary authority) that it is not battery for a person to pull away from the pinch of an unexplained stranger. And while assuming a confrontation-ready physical stance in response to a stranger's pinch might not be the most common reaction in society, and perhaps might even seem a bit paranoid, it too is not the crime of battery, the only crime proffered by Lewis.

As it would have been clear to a reasonable officer in Lewis's position that he was arresting Miller without probable cause to believe Miller had committed a battery, a clearly unlawful act, Lewis is not entitled to summary judgment on Count I on grounds of qualified immunity. Summary judgment is accordingly denied as to Count I.

2. Count II — Excessive Force

Miller claims that Lewis used excessive force in effectuating his arrest by grabbing

Miller's arm, drawing his weapon and pointing it at Miller, and grabbing Miller by the front of his shirt. When a claim of excessive force arises in the context of an arrest, the Court evaluates the officer's use of force "according to the reasonableness standard of the Fourth Amendment." *Morfin*, 349 F.3d at 1004 (citing *Graham v. Connor*, 490 U.S. 386, 394 (1989)).

> Determining whether the force used to effect a particular seizure is "reasonable" under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing

governmental interests at stake. Our Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it. Because the test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application, however, its proper application requires careful attention to the facts and circumstances of each particular case. . . .

*Graham*, 490 U.S. at 396 (internal quotation, citation and alteration omitted); *see also Morfin*, 349 F.3d at 1004. Factors to be considered by the court include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396 (citing *Tennessee v. Garner*, 471 U.S. 1, 9 (1968)). This constitutional inquiry is an objective one, and it is implemented "from `the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'" *Payne*, 337 F.3d at 757 (quoting *Graham*, 490 U.S. at 396-97). Moreover, "when material facts (or enough of them to justify the conduct objectively) are undisputed," the question of the reasonableness of the force is a legal question for the Court to decide. *Bell v. Irwin*, 321 F.3d 637, 640 (7th Cir. 2003). If, however, material facts are in dispute as to whether the police "acted unreasonably because they responded overzealously and with too little concern for safety," the case must go to a jury. *Id.*

The Court first dispenses with Miller's argument that Lewis grabbing him by the arm was

excessive in the circumstances. The undisputed facts show that Lewis was following Miller in order to question him about an overpayment. When Lewis and Tyse called out Miller's name, he turned but did not stop walking. (Def. SF ¶¶ 28, 29.) When Lewis and Tyse finally caught up with Miller after calling his name a second time, Miller denied Tyse's allegation that he owed the casino $500. (*Id.* ¶ 30; Pl. SAF ¶ 17.) At this point, Miller turned and walked away, then reversed his direction and kept walking — away from Tyse and Lewis. (Def. SF ¶¶ 32, 33.) (Miller's explanation that he changed direction because he was disoriented (*see* Pl. SAF ¶ 18) is not relevant to the analysis, which is viewed from the perspective of the officer. *See Graham*, 490 U.S. at 396.) It was at this point that Lewis grabbed Miller by the arm in a pinching grip, to take the facts in the light most favorable to Miller. (Pl. SAF ¶ 19.) Miller does not allege, nor would the videotape support, any claim that Lewis was wrenching Miller's arm or using it to slam him against the corridor wall or any similar action.

After Miller told Lewis to take his hands off him — Miller testified that he told Lewis to "Get your fucking hands off of me right now" (D.E. 42, Ex. 9 (Miller Dep.) at 46) — Lewis pinched Miller's arm tighter. (Pl. SAF ¶¶ 22, 23.) In balancing the "nature and quality of the intrusion" on Miller's Fourth Amendment interests, and the "countervailing governmental



07/20/2008 23:33 FAX 4015961327 ATTORNEY MICHAEL BRADLEY 010

interests at stake," *Graham*, 490 U.S. at 396 (internal quotations omitted), the Court finds that grabbing Lewis's arm, even in a manner that pinched, does not constitute excessive force. Miller was making what reasonably could have been perceived as evasive maneuvers in response to questioning by Tyse regarding the overpayment. Physically stopping Miller was reasonable in that instance given the interests of the Illinois Gaming Board in stopping a customer who may

have improperly retained casino funds in violation of state law and casino rules.**[fn7]** Importantly, the Court notes that Miller has not offered any evidence of physical injury as a result of Lewis pinching his arm. Nor is Lewis alleged to have contorted or twisted Miller's arm in any violent manner. The Court finds that the alleged momentary, if uncomfortable, use of force was not excessive under the totality of the circumstances.

Miller next claims that Lewis used excessive force when he drew his weapon. Although, as explained above, there is a dispute as to whether Miller pushed Lewis during the physical engagement between the two, there is no dispute that Miller raised his arms toward Lewis in a conflict-ready stance after the two men forcibly disengaged. (Lewis SF ¶ 37; Pl. SAF ¶ 26; Lewis Resp. to Pl. SAF ¶ 26; Videotape at approximately 14:08:54 to approximately 14:08:57.) It was not until after Miller assumed or was assuming this posture that Lewis drew his weapon. It is undisputed that Lewis pointed the weapon at Miller, but he did so only until Miller dropped his hands to his side (Lewis SF ¶ 39; Pl. SAF ¶ 32) — a period that appears to have encompassed some four seconds (Videotape at approximately 14:08:54 to approximately 14:08:57), or less time than it would take most people to read many sentences in this opinion. After Miller dropped his hands, Lewis grabbed the front of Miller's shirt while Lewis was still holding his firearm. (Pl. SAF ¶ 33.) The video shows, however, that the firearm was pointed to the side, away from Miller. (See Videotape at approximately 14:09:00.) This action, too, lasted a matter

of seconds before Lewis reholstered his firearm and handcuffed Miller. (Pl. SAF ¶ 34.) During this period of time, the videotape does not suggest that Lewis was using Miller's shirt to try to choke him in any way, or using the grabbed shirt to toss Miller (who is a man of substantial size) about, nor is there any allegation to that effect by Plaintiff.

The Court finds that under the circumstances, Lewis's actions did not constitute excessive force. Even if there was no probable cause to believe that Miller committed battery on Lewis when he pulled away from Lewis (according to Miller's version of the events), Miller's actions after he pulled away justified Lewis's decision to draw his weapon. It is undisputed that Miller then took a posture with his arms and hands raised toward Lewis — what the parties have characterized as a "defensive stance." (Lewis SF ¶ 37; Pl. SAF ¶ 26; Lewis Resp. to Pl. SAF ¶ 26.) Lewis did not draw his weapon until Miller assumed or was assuming this stance — a posture which reasonably could appear as (indeed, would be difficult to interpret as anything other than as) a conflict-ready physical position. In addition, as the Court has explained, Plaintiff is a man of substantial size who does not appear frail or weak. And, by Plaintiff's own admission, he had

just told Lewis to "[g]et your fucking hands off of me right now" – hardly the sort of statement that would induce a reasonable listener to presume that Mr. Miller is likely a man characterized by reflection and restraint.

Although by no means essential to the Court's analysis, the Court notes the commonsense truism – well known by most people in the criminal justice arena, and particularly police officers – that a loaded gun is often a dangerous aggravator in any hand-to-hand encounter or wrestling match, not a cause for reassurance about safety. Even if the gun is appropriately secured at the officer's side, the civilian may try to grab the gun, irrespective of whether he is

winning or losing the fight; and the dynamic can become volatile even if one person simply perceives (even incorrectly) that the other has tried to reach for the gun. Even if no one makes a move towards the weapon, the gun can discharge accidentally as well. As a result, in the split second (literally) as Miller was assuming his conflict-ready physical pose, Lewis had to decide whether to grab his weapon and put it in a position where he could use it if necessary, or whether he would do something else and see what Miller (who was a big man who had just cursed him) was going to do. Under these circumstances, precedent does not allow the Court to second-guess Lewis's decision not to "play it by ear" and see how things would unfold.

This is not to say that Lewis's decision was indisputably correct or the most prudent step available. One can (as the Court has) run the operative seconds of the altercation in a video-recorder, unpacking the handful of seconds into twenty or thirty minutes on a frame-by-frame, slow-motion basis, run back and forth multiple times. And after that exercise, one can reflect intermittently over the course of a couple days about whether pulling the weapon was the ideal course. And, after that reflection, one can have a fair debate with another viewer about whether pulling and pointing the weapon was the best option available. Reasonable people likely could respectfully disagree at the end of such a review and discussion.

However, what is not subject to dispute is that this sort of armchair second guessing is specifically what precedent instructs courts *not* to do. As the Supreme Court taught in *Graham v. Connor*:

> With respect to a claim of excessive force, the . . . standard of reasonableness at the moment applies: Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment. The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly
>
> evolving – about the amount of force that is necessary in a particular situation. *Id.*, 490 U.S. at 396-97 (internal quotation marks and citation omitted). Under this standard, the Court finds that summary judgment for Lewis on the excessive force



07/20/2008 23:34 FAX 4015961327 ATTORNEY MICHAEL BRADLEY 012

claim is warranted.[fn8]

Precedent instructs that an excessive force claim must be evaluated on the facts of the particular case at hand, and there is no precedent cited that is squarely on point. Nonetheless, it merits mention that the cases on which Miller relies for the proposition that pointing a gun at a person constitutes excessive force are easily distinguishable from the situation in this case. In *MacDonald v. Haskins,* 963 F.2d 292 (7th Cir. 1992), the Seventh Circuit held that the allegation that an officer aimed his gun at a passive nine-year-old boy during the course of a search and then threatened to shoot was, if true, "objectively unreasonable given the alleged absence of any danger to Haskins or the other officers at the scene and the fact that the victim, a child, was neither attempting to evade the officer or posing any other threat." *Id.* at 295. *MacDonald* is distinguishable from the situation in the instant case, where an adult male was taking a potentially aggressive stance against the officer — a situation fraught with much more potential danger than an officer facing a passive child — and the officer needed to decide in a split-second whether to draw his weapon as the civilian was assuming his confrontation-ready pose. In *Robinson v. Solano,* 278 F.3d 1007, 1010 (9th Cir. 2002) (*en banc*), a divided *en banc* panel of the Ninth Circuit held that an officer used excessive force by pointing his gun at the plaintiff's head at point blank range. Officers were responding to a call that the plaintiff had shot some dogs in the neighborhood, and the plaintiff merely walked forward to meet the officers, stated his name, and told the officers that he was the person involved with the dogs. *Id.* The panel held that the officer used excessive force in pointing the gun at the plaintiff's head at point blank range given the absence of any factors justifying the use of force, particularly that the suspect was apparently unarmed and approached the officers in a peaceful way, and that there were no dangerous or exigent circumstances. *Id.* at 1014. Again, *Robinson* is distinguishable from the case *sub judice* given that Miller was not acting in a peaceful manner at the time Lewis drew his weapon. *Compare Jacobs v. City of Chicago,* 215 F.3d 758, 773 (7th Cir. 2000) (no qualified immunity where, during otherwise lawful search, officers placed a gun to the head of 60-year-old plaintiff for over ten minutes who was not suspected of criminal activity and "did nothing more threatening than provide the officer with his identification and asked officer for permission to sit down").

Here, Lewis drew his weapon and diffused a situation in which Miller had assumed a stance that could be interpreted as ready for a fight. Lewis pointed his firearm at Miller for a handful of seconds, which began as Miller was assuming his physical stance, and Lewis stopped pointing the weapon at Miller as soon as Miller lowered his arms and stood normally. There is no evidence that Lewis made any kind of accompanying threats of violence, such as a threat to pull the trigger. Given the increased tension of the situation that occurred when Miller raised his arms toward Lewis and the very short time frame during which Lewis's weapon was drawn — including the even shorter time frame when the firearm was pointed at Miller — the Court finds that Lewis did not use



07/20/2008 23:34 FAX 4015961327 ATTORNEY MICHAEL BRADLEY 013

excessive force in diffusing the situation. *See Molina v. Cooper*, No. 00 C 50230, 2002 WL 426035, at *7 n. 2 (N.D. Ill. March 18, 2002) (Reinhard, J.)

(stating in *dicta* that briefly pointing a gun at a suspect, just long enough to handcuff her, where the officer never threatened to pull the trigger, did not rise to the level of a Fourth Amendment violation); *cf. Wilkins v. May*, 872 F.2d 190, 194 (7th Cir. 1989) (noting that "[w]here the officer merely points a gun at a suspect in the course of arresting him, the suspect would have no basis for claiming that he had been seized with excessive force in violation of the Constitution" under other circuits' caselaw).**[fn9]**

The only other force used after Lewis dropped his weapon to his side was grabbing Miller by the shirt. The Supreme Court cautions that "[n]ot every push or shove, even if it may seem unnecessary in the peace of a judge's chambers, . . . violates the Fourth Amendment." *Graham*, 490 U.S. at 396 (internal quotation and citation omitted). This relatively minor amount of force does not bring a constitutional dimension to a case that otherwise does not constitute excessive force. The total force used by Lewis was not excessive given the circumstances: Lewis did not use the shirt to try to choke Miller, or throw him about, but instead kept Miller under relatively secure control (Miller was not resisting, but Lewis certainly could not predict the future) during

the first portion of relative calm after the four seconds involving the combat-ready stance and the pointed gun. Because the Court finds that there was no constitutional violation, summary judgment as to Plaintiff's excessive force count, Count II, is proper.**[fn10]**

B. Harrah's Motion for Summary Judgment

In a single count in his complaint, Miller alleges that Harrah's involvement in the events on May 5, 2002, "constitute[d] false imprisonment, fraud and extortion." (Compl. ¶ 18.)

Harrah's moves for summary judgment on Miller's claim for false imprisonment on the grounds that there was at least probable cause to believe that Miller was committing theft by retaining the alleged $500 overpayment after Harrah's demanded it back. To sustain a cause of action for false imprisonment or false arrest under Illinois law, Miller must prove that Harrah's restrained or arrested him without having reasonable grounds to believe that he was committing an offense. *See Johnson v. Target Stores, Inc.*, 791 N.E.2d 1206, 1220 (Ill.App.Ct. 2003) (citing *Meerbrey v. Marshall Field & Co.*, 564 N.E.2d 1222, 1231 (Ill. 1990)); *Carey v. K-Way, Inc.*, 728 N.E.2d 743, 746 (Ill.App.Ct. 2000) (citing *Meerbrey, supra*). Harrah's does not

dispute that it restrained Miller, but rather argues that the undisputed evidence shows that Harrah's had reasonable grounds to believe that Lewis had committed or was committing theft. "Reasonable grounds" is the same standard as probable cause, which under Illinois law is "`a state of facts that would lead a person of ordinary caution and prudence to believe, or to

entertain an honest and strong suspicion, that the person arrested committed the offense charged.'" *Johnson*, 731 N.E.2d at 1225 (quoting *Rodgers v. Peoples Gas, Light & Coke Co.*, 733 N.E.2d 835, 842 (Ill.App.Ct. 2000)).[fn11]

Harrah's asserts that it had probable cause to restrain Miller under the Illinois general theft statute, which states that a person commits theft when he knowingly:

(1) Obtains or exerts unauthorized control over property of the owner; or

(2) Obtains by deception control over property of the owner; or

(3) Obtains by threat control over property of the owner; or

(4) Obtains control over stolen property knowing the property to have been stolen or under such circumstances as would reasonably induce him to believe that the property was stolen; or

(5) Obtains or exerts control over property in the custody of any law enforcement agency which is explicitly represented to him by any law enforcement officer or any individual acting in behalf of a law enforcement agency as being stolen, and

(A) Intends to deprive the owner permanently of the use or benefit of the property; or

(B) Knowingly uses, conceals or abandons the property in such a manner as to deprive the owner permanently of such use or benefit; or

(C) Uses, conceals, or abandons the property knowing such use, concealment, or abandonment probably will deprive the owner permanently of such use or benefit.

720 ILCS 5/16-1(a). Harrah's does not argue that it had reasonable cause to believe that Lewis knowingly obtained $500 belonging to Harrah's at the time he received his winnings from the cashier. Rather, Harrah's argues that Miller's refusal to return the $500 upon Harrah's request, together with his action of walking away after the request for the return of the money, was sufficient to constitute probable cause that Miller was committing theft. (Harrah's Mot. at 5.) The question before the Court, then, is whether, under Illinois law, retention of another person's property that has been mistakenly given to a defendant constitutes theft.

Harrah's points to cases which it believes establish that refusal to return property on reasonable demand constitutes theft. *See People v. Block*, 540 N.E.2d 513 (Ill.App.Ct. 1989); *Guzell v. Hiller*, 223 F.3d 518 (7th Cir. 2000). These cases are not particularly helpful given that they are analyzing

theft provisions different than those in this case. *See Block,* 540 N.E.2d at 516-17 (possession and retention of stolen property); *Guzell,* 123 F.3d at 522-23 (interpreting intent to keep property "permanently," which applies to obtaining stolen property from a law enforcement agency). Illinois precedent does suggest that a person exerts unauthorized control over another person's money, even when lawfully given in the first instance, where the party has the right to demand return of the money given. *See generally People v. Mattingly,* 245 N.E.2d 647, 648-49 (Ill.App.Ct. 1969) (theft not proved where landlord refused tenant's demand to return security deposit where tenant had no right to demand deposit). But Harrah's need not jump through hoops in the caselaw to find support in Illinois law for the proposition that, if Harrah's mistakenly gave Miller an additional $500, it constituted theft for him to refuse to return it on demand; Illinois has a statute which prohibits that precise action.

Section 16-2, titled "Theft of Lost or Mislaid Property," states,

A person who obtains control over lost or mislaid property commits theft when he:

(a) Knows or learns the identity of the owner or knows, or is aware of, or learns of a reasonable method of identifying the owner, and

(b) Fails to take reasonable measures to restore the property of the owner, and

(c) Intends to deprive the owner permanently of the use or benefit of the property.

720 ILCS 5/16-2. Looking at the circumstances surrounding Miller's detention by Harrah's, the Court finds that Harrah's had reasonable cause to believe Miller was committing theft by intending to permanently deprive Harrah's of property it had, in effect, mislaid by unintentionally giving it to Miller. Harrah's made Miller aware that the he was not the rightful owner of $500 in his possession, and Miller failed to take any steps to return the money to Harrah's. Miller's attempts to walk away from Lewis and Tyse would have appeared to a person of ordinary caution and sense as though Miller intended to leave the premises and permanently deprive Harrah's of its property. Whether a jury would have found such facts proven beyond a reasonable doubt at a putative prosecution need not be shown, as that unknown answer does not govern the existence of reasonable cause on the part of Harrah's concerning the charge. *See generally People v. Jones,* 830 N.E.2d 541, ___ (Ill. 2005) ("Probable cause, *i.e.,* sufficient evidence to justify the reasonable belief that the defendant has committed or is committing a crime, `does not demand any showing that such a belief be correct or more likely true than false.'"). Thus, Miller has failed to demonstrate that he was restrained by Harrah's without reasonable grounds to believe he was committing an offense, and summary judgment is proper as to Miller's false imprisonment claim.



07/20/2008 23:35 FAX 4015961327 ATTORNEY MICHAEL BRADLEY 016

Harrah's moves for summary judgment as to Miller's claims for fraud and extortion on

the ground that Miller has put forward no evidence to support those theories. In order to establish a claim for common law fraud in Illinois, Miller must prove: (1) Harrah's made a false statement of material fact; (2) Harrah's knew or believed the statement to be untrue; (3) Miller had a right to rely on the statement and did so; (4) the statement was made for the purpose of inducing Miller to act; and (5) reliance by Miller led to his injury. *See Siegel v. Levy Org. Dev. Co., Inc.*, 607 N.E.2d 194, 198 (Ill. 1992) (citing *Redarowicz v. Ohlendorf*, 441 N.E.2d 324, 331 (Ill. 1982)); *accord Kapelanski v. Johnson*, 390 F.3d 525, 530-31 (7th Cir. 2004) (citing *Soules v. Gen. Motors Corp.*, 402 N.E.2d 599, 601 (Ill. 1980)). Miller apparently argues (although it is not entirely clear from Miller's brief) that the false statement made by Harrah's was that Harrah's would charge Miller with theft if he left the Harrah's Casino without returning the $500 overpayment. (D.E. 48 at 6.) Miller then alleges, without any citation to the record or by proffering any other kind of evidence, that "Harrah's knew that they would not be able to prosecute the Plaintiff because the loss was caused by their own error." (*Id.* at 6-7.)

This mere allegation by Miller is insufficient on summary judgment to prove either (1) that the statement by Harrah's regarding its intent to prosecute Miller was false, or (2) that Harrah's knew or believed it to be untrue. Whether Harrah's would have ultimately prevailed in a case against Miller for theft (which the Court need not decide) is irrelevant to whether the statement that Harrah's would bring charges against Miller is true or false. Miller has produced nothing that would demonstrate that Harrah's was posturing without any intent potentially to bring such charges. Because Miller has failed to adduce evidence as to an essential element of

his claim for fraud, summary judgment is proper.**[fn12]** *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In addition, Miller has adduced nothing to call into question the sincerity of Harrah's belief that the $500 Miller possessed was not money that legitimately was his. Thus, to the extent Miller alleges fraud on such basis (through his repeated assertions that he did not agree with the assertion that he owed $500), it too fails, as Miller offers nothing to show that Harrah's was falsely representing its view.

Under Illinois law, extortion and blackmail are synonymous terms. *See Heck v. Schupp*, 68 N.E.2d 464, 465 (Ill. 1946); *Jordan v. Knafel*, 823 N.E.2d 1113, 1119 (Ill.App.Ct. 2005) (citing *Becker v. Zellner*, 684 N.E.2d 1378, 1388 (Ill.App.Ct. 1997)). "Blackmail has been defined as `[a] threatening demand made without justification[, and the] gravamen of these offenses is the exercise of coercion or an improper influence.'" *Jordan*, 823 N.E.2d at 1119 (quoting Black's Law Dictionary 163 (7th ed. 1999), and citing *People v. Hubble*, 401 N.E.2d 1282, 1284 (Ill.App.Ct. 1980)). Miller argues that Harrah's committed extortion by threatening to bring charges against him if he did not pay the $500 at issue. Illinois law teaches, however, that "declaring that one intends to use the courts to insist upon what he

believes to be his legal rights is not actionable as intimidation, extortion or blackmail." *Jordan*, 823 N.E.2d at 1123 (internal citations, quotations, and alterations omitted). The undisputed facts of the case

demonstrate that Harrah's did nothing more than assert its intention to use the legal system to retrieve the money that it believed Miller improperly possessed. As discussed above, Miller has produced no evidence that would demonstrate that Harrah's was doing anything more than alerting Miller of its intention potentially to assert its legal rights against him, should Miller decide not to pay the $500. Regardless of whether Harrah's would have been able to prevail (although the only evidence in the record indicates that Harrah's did, indeed, overpay Miller), this situation does not constitute extortion, and summary judgment is proper as to Miller's extortion claim. Furthermore, Plaintiff has also failed to adduce any evidence that Harrah's had any illicit scienter because Miller may not have agreed that he owed the $500. Harrah's certainly had established its belief of that fact, which also is inconsistent with an intention to exert an improper influence against Miller through an expressed intention to invoke potential legal remedies.

**IV. Conclusion**

For the reasons stated above, the Court grants Lewis's motion for summary judgment in part (Count II) and denies it in part (Count I) (D.E. 42). The Court grants Harrah's motion for summary judgment (Count III) (D.E. 43).

So ordered.

[fn1] The docket entries in this case are designated as "D.E. ___."

[fn2] The Court takes the relevant facts from Lewis's Local Rule 56.1(a)(3) statement of facts ("Lewis SF") (D.E. 42) and Plaintiff's responses thereto ("Pl. Resp. to Lewis SF") (D.E. 47); from Harrah's Local Rule 56.1(a)(3) statement of facts ("Harrah's SF") (D.E. 43) and Plaintiff's response thereto ("Pl. Resp. to Harrah's SF") (D.E. 49); and from Plaintiff's Local Rule 56.1(b)(3)(B) statement of additional facts ("Pl. SAF") (D.E. 50) and Lewis's and Harrah's responses thereto ("Lewis Resp. to Pl. SAF," and "Harrah's Resp. to Pl. SAF," respectively) (D.E. 53, 54). There also are various references to a surveillance videotape of at least some of the operative events, which videotape the parties have submitted. Where the parties disagree over relevant facts, the Court sets forth the competing versions. In addition, the Court resolves genuine factual ambiguities in Plaintiff's favor. *Foley v. City of Lafayette*, 359 F.3d 925, 928 (7th Cir. 2004).

Local Rule 56.1 ("L.R.56.1") requires that statements of facts contain allegations of material fact, and the factual allegations must be supported by admissible record evidence. *See* L.R. 56.1; *Malec v. Sanford*, 191 F.R.D. 581, 583-85 (N.D. Ill. 2000). The Seventh Circuit teaches that a district court has broad discretion to require strict compliance with L.R. 56.1. *See*,

*e.g.*, *Koszola v. Bd. of Ed. of City of Chicago*, 383 F.3d 1104, 1109 (7th Cir. 2004); *Curran v. Kwon*, 153 F.3d 481, 489 (7th Cir. 1998) (citing *Midwest Imports, Ltd. v. Coval*, 71 F.3d 1311, 1316 (7th Cir. 1995) (collecting cases)). Where a party has offered a legal conclusion or a statement of fact without offering proper evidentiary support, the Court will not consider that statement. *See, e.g.*, *Malec*, 191 F.R.D. at 583 ("[A] movant's 56.1(a) statement should contain only factual allegations. It is inappropriate to allege legal conclusions."); *id.* ("Factual allegations not properly supported by citation to the record are nullities."). Additionally, where a party improperly denied a statement of fact by failing to provide adequate or proper record support for the denial, the Court deems admitted that statement of fact. *See* L.R. 56.1(a), (b)(3)(B); *see also Malec*, 191 F.R.D. at 584 (failure to adhere to L.R. 56.1 requirements, including citation to specific evidentiary materials justifying denial, is equivalent to admission). The Court disregards any additional statements of fact contained in a party's response rather than its statement of additional facts. *See Malec*, 191 F.R.D. at 584 (L.R. 56.1(b)(3)(B) statement is the only acceptable means of presenting additional facts to the Court).

[fn3] There is a dispute over precisely what was said at this point. Tyse testified that he told Miller that he needed to come back to the cage to discuss a $500 overpayment. (Lewis Ex. 5 (Tyse Dep.) at 33.) Lewis testified that Tyse identified himself as a security officer and said that the cage cashier supervisor wanted to talk to Miller. (Lewis Ex. 3 (Lewis Dep.) at 58-59.) On summary judgment, the dispute is resolved in Miller's favor. *See Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003).

[fn4] Lewis denies pinching or squeezing Miller's arm at any time. (Lewis Resp. to Pl. SAF ¶ 22.) This dispute is resolved in Miller's favor on summary judgment. *See Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003).

[fn5] While the Court is unaware of court resources that would allow for the reproduction of a frame from the videotape, such that it could be included as an exhibit to this opinion, the stance is fairly characterized as a sort of a karate-type stance, albeit perhaps an untutored one. (*See* Videotape at counter timer 14:08:56.) At the same time, the Court does not want to overstate any description — as explained further below, the entire time that Miller was in his physical stance, and the entire time that Lewis could have been pointing his weapon at Lewis (the two periods essentially overlap) appears to have been approximately four seconds. The timer for this overlapping time period reads approximately 14:08:54 to approximately 14:08:57 on the videotape. The parties agree that the videotape accurately portrays the events it records, and while they have not expressly vouched for the accuracy of the timing mechanism, they have not suggested it is erroneous either. Furthermore, the pace of the events on the videotape as it is viewed is not such that there is any suggestion of substantial error concerning the time measurement reflected on the videotape, particularly because the

measurement relates to such a brief window of time (*i.e.*, approximately four seconds).

[fn6] While probable cause is analyzed from the perspective of a reasonable police officer, not an omniscient observer, that does not mean that the analysis proceeds at the summary judgment stage on the basis of the facts as asserted by the police officer — at least where those factual assertions are controverted by competent evidence from the non-movant.

[fn7] The Court finds that given the calls by Ms. Lopez regarding the overpayment, there was at least reasonable suspicion for Lewis to make an investigatory stop of Miller regarding the overpayment, which could have constituted theft from the casino had Miller taken the retained the money intentionally. *See* discussion of theft, *infra*. "Reasonable suspicion is a less demanding standard than probable cause, requiring only that the officer have a reasonable, articulable suspicion that criminal activity may be afoot." *Marshall,* 284 F.3d at 776 (citing *Illinois v. Wardlow,* 528 U.S. 119, 123 (2000)).

[fn8] The Court also notes that Lewis did not draw the weapon in a crowded area such as the gaming floor. The three men were in a corridor/hallway between the casino and coffee shop, near the wall of the broad walkway. (*See* Videotape at approximately 14:08:45 to approximately 14:09:10.)

[fn9] Plaintiff asserts that *Wilkins,* a pre-*Graham v. Connor* case, applied a "shock the conscience" test that is not prescribed by *Connor.* (*See* D.E. 46 at 9.) But even if *Wilkins* applied a more deferential test towards police conduct, and even if one were to question whether *Wilkins*'s seemingly sweeping statement that "[w]here the officer merely points a gun at a suspect in the course of arresting him, the suspect would have no basis for claiming that he had been seized with excessive force in violation of the Constitution" is valid as to each and every instance where an arrest or *Terry*-stop is being made, that does not prove the opposite proposition — namely that it always is improper to point a weapon at a person in a rapidly-evolving and potentially inflammatory situation, unless and until that person first draws some type of weapon and displays it (or makes an aggressive move with it, or threatens such conduct, etc.). Excessive force cases, like many areas of criminal procedure dealing with police conduct, are evaluated in a fact-specific way. The facts of this case warrant the same conclusion reached in the *Wilkins* statement — i.e., that the officer's act of drawing his weapon was not subject to legitimate second-guessing under the circumstances.

[fn10] Because of the Court's disposition on prong one of the qualified immunity analysis, the Court need not engage in the second prong — determining whether the supposed rule violated was clearly established at a meaningful degree of specificity as of 2002. *See Saucier v. Katz,* 533 U.S. 194, 201 (2001). Plaintiff apparently would seek to rely on a rule that it is *per se*

unconstitutional to point a gun at the head of an apparently unarmed suspect during an investigation (D.E. 46 (relying on *Robinson v. Solano County*, 278 F.3d 1007 (9th Cir. 2002)). But even if *Solano* were not distinguishable (as it is), and even if the Seventh Circuit would likely be inclined to draw heavily from that decision, its general views would not appear to clearly establish the rule Plaintiff offers, at least if one considers teaching that suggests a different or more flexible rule. *See, e.g., Courson v. McMillian*, 939 F.2d 1479, 1493 (11th Cir. 1991) (rejecting excessive force claim of unarmed woman forced to lie on ground at point of shotgun for some thirty minutes, even after several officers had arrived on scene and had arrested her two male unarmed companions, when she was not uncooperative or combative in any manner, and when she was not allowed from ground until companions were taken from the scene).

[fn11] Plaintiff does not allege that if he was permissibly detained, that the duration of his detention (less than one hour) was unreasonable or unduly excessive.

[fn12] Miller's argument that "Harrah's has not argued any relevant facts or proposed any examples of case law to contradict the Plaintiff's allegations," (D.E. 48 at 7), is misplaced. On summary judgment, the "burden on the moving party may be discharged by `showing' — that is, pointing out to the district court — that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Here, Harrah's has pointed out to the Court that there is no evidence to support Lewis's claims. Lewis, the nonmoving party, retains the burden of "set[ting] forth specific facts showing that there is a genuine issue for trial." *Id.*

Copyright © 2008 Loislaw.com, Inc. All Rights Reserved